IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| COMPREHENSIVE HEALTH OF PLANNED PARENTHOOD GREAT PLAINS, on behalf of itself, its patients, physicians, and staff; and REPRODUCTIVE HEALTH SERVICES OF PLANNED PARENTHOOD OF THE SAINT LOUIS REGION, on behalf of itself, its patients, physicians, and staff,<br><br>                            Plaintiffs,<br><br>v.<br><br>RANDALL W. WILLIAMS, MD, in his official capacity as Director of the Missouri Department of Health and Senior Services; JOSHUA D. HAWLEY, in his official capacity as Attorney General of Missouri; DANIEL KNIGHT, in his official capacity as Boone County Prosecutor; JEAN PETERS BAKER, in her official capacity as Jackson County Prosecutor; THERESA KENNEY, in her official capacity as Jasper County Prosecutor; DAN PATTERSON, in his official capacity as Greene County Prosecutor,<br><br>                            Defendants. | Case No. 2:17-cv-4207 |

## COMPLAINT

Plaintiffs, by their undersigned attorneys, bring this Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof state the following:

**I.    PRELIMINARY STATEMENT**

1. This is an action for declaratory and injunctive relief brought under the U.S. Constitution and 42 U.S.C. § 1983, challenging the constitutionality of an emergency regulation imposed by the Missouri Department of Health and Senior Services ("DHSS"), as Mo. Code

Regs. Ann. tit. 19 § 30-30.061 (the "Complication Plan Regulation" or the "Regulation"), and DHSS's interpretation thereof, as well as Mo. Ann. Stat. § 188.021(2) insofar as Plaintiffs cannot provide medication abortion without approval of a complications plan that meets DHSS's requirements. A copy of the Regulation is attached as Exhibit A.

2. The Complication Plan Regulation, as it is being enforced by DHSS, requires providers of medication abortion (and medication abortion only) to have a written agreement with a board-certified or board-eligible obstetrician-gynecologist ("ob-gyn") or group of ob-gyns who has agreed to be "on call and available twenty-four hours a day, seven days a week" to "personally treat all complications" from medication abortion. And, DHSS is further requiring that this ob-gyn also have hospital admitting privileges near the facility where the woman obtains the medication abortion.

3. The Regulation—and DHSS's interpretation of it—is the latest in a series of medically unnecessary requirements imposed by the State, which will, without basis, limit women's access to an extremely safe procedure using medications alone. The Regulation is *already* preventing a licensed abortion facility in Columbia from providing medication abortion; it had to cancel some women's medication abortion procedures, and without relief from this Court, it will have to cancel more medication abortions scheduled for Monday, November 6.

4. The Columbia facility is not the only one that will be unable to provide medication abortion due to the Regulation and DHSS's interpretation of it. Therefore, as a result of the Complication Plan Regulation, all women who do not live near Kansas City or St. Louis will have to travel farther to access medication abortion; some will be delayed beyond the point when medication abortion is available, which will increase the risk to their health; and some will be unable to access abortion at all.

2

5. In order to prevent these irreparable harms to their patients and to protect their constitutional rights, Plaintiffs seek a temporary restraining order against enforcement of the Regulation against the Columbia health center and its physician, followed by a preliminary and a permanent injunction against enforcement of the Complication Plan Regulation against Plaintiffs' health centers and physicians and a declaration that it is unconstitutional.

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

7. Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

8. Venue in this Court is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this district and because Defendants Williams and Hawley, in their official capacities, reside in the Central Division of the Western District of Missouri.

## III. PARTIES

### A. Plaintiffs

9. Plaintiff Comprehensive Health of Planned Parenthood Great Plains ("Comprehensive Health") is a not-for-profit corporation organized under the laws of Kansas and registered to do business in Missouri. Comprehensive Health operates two health centers in the state of Missouri, both of which are licensed to provide abortions: one is the Patty Brous-Kansas City Center in Kansas City, Missouri, which is licensed to provide only medication abortion, and the other is the Columbia Center in Columbia, Missouri, which was recently granted a license to

3

provide both medication and surgical abortion. Plaintiff Comprehensive Health sues on behalf of itself, its patients, physicians, and staff.

10. Plaintiff Reproductive Health Services of Planned Parenthood of the St. Louis Region, Inc. ("RHS") is a not-for-profit corporation organized under the laws of Missouri. RHS provides both medication and surgical abortion services at a health center in St. Louis, Missouri. It is also in the process of seeking licensure by DHSS to provide medication abortions at Planned Parenthood health centers in Springfield and Joplin, Missouri. Plaintiff RHS sues on behalf of itself, its patients, physicians, and staff.

### B. Defendants

11. Defendant Randall W. Williams, MD, is the Director of DHSS, the agency responsible for abortion facility licensure, Mo. Ann. Stat. §§ 197.205, 197.215, as well as for adopting the Complication Plan Regulation and approving complication plans. Director Williams is sued in his official capacity, as are his employees, agents, and successors.

12. Defendant Joshua D. Hawley is the Attorney General of the State of Missouri. He is charged by law with defending the interests of the State in civil tribunals, including this Court. Attorney General Hawley has original jurisdiction throughout the state to prosecute the provision of abortions that are in violation of Mo. Ann. Stat. § 188.021(2), including the ability to seek injunctive relief. He is sued in his official capacity, as are his employees, agents, and successors.

13. Defendant Daniel Knight is the Prosecuting Attorney for Boone County, Missouri, where the Columbia health center is located. He is authorized to prosecute the provision of abortions that are in violation of Mo. Ann. Stat. § 188.021(2). Defendant Knight is sued in his official capacity, as are his employees, agents, and successors.

14. Defendant Jean Peters Baker is the Prosecuting Attorney for Jackson County, Missouri, where the Kansas City health center is located. She is authorized to prosecute the provision of abortions that are in violation of Mo. Ann. Stat. § 188.021(2). Defendant Baker is sued in her official capacity, as are her employees, agents, and successors.

15. Defendant Theresa Kenney is the Prosecuting Attorney for Jasper County, Missouri, where the Joplin health center is located. She is authorized to prosecute the provision of abortions that are in violation of Mo. Ann. Stat. § 188.021(2). Defendant Kenney is sued in her official capacity, as are her employees, agents and successors.

16. Defendant Dan Patterson is the Prosecuting Attorney for Greene County, Missouri, where the Springfield health center is located. He is authorized to prosecute the provision of abortions that are in violation of Mo. Ann. Stat. § 188.021(2). Defendant Patterson is sued in his official capacity, as are his employees, agents, and successors.

## IV. FACTUAL ALLEGATIONS

### A. Medication Abortion and Its Provision in Missouri

17. Legal abortion is one of the safest procedures in contemporary medical practice. Abortion complications are exceedingly rare: nationwide, fewer than one-quarter (0.23%) of 1% of all abortion patients (all procedures and gestational ages) experience a complication that requires hospital admission, surgery, or blood transfusion.

18. Women seek abortions for a variety of reasons, including familial, medical, financial, and personal. Among other reasons, some women have abortions because they do not want to start or add to their family at that time, some to preserve their life or their health, and some because they have become pregnant as a result of rape or incest. Some women who seek abortions do so because the fetus has been diagnosed with a medical condition or anomaly.

Approximately one in four women in this country will have an abortion by age 45. Most women having abortions (61%) already have at least one child, and 66% plan to have children in the future.

19. There are two types of abortion: surgical abortion and medication abortion. In a surgical abortion, instruments are used to remove the products of conception from the uterus. For the past couple of years up until this month, RHS's health center in St. Louis was the only licensed provider of surgical abortion in the entire state. The Columbia health center has at times provided surgical abortion, but its ability to do so has been limited by other medically unnecessary restrictions that are challenged in a separate, ongoing lawsuit. As a result of a preliminary injunction in that case, on October 3, 2017, Plaintiff Comprehensive Health obtained an abortion facility license to provide surgical and medication abortions at the Columbia health center. Before today, it has only provided medication abortion.

20. Medication abortion is only available early in a woman's pregnancy and involves a combination of two pills: mifepristone and misoprostol. The woman takes the first medication in the health center and then 24–48 hours later, takes the second medication at a location of her choosing, most often at her home, after which she expels the contents of the pregnancy similar to a miscarriage.

21. Medication abortion abortion is an increasingly utilized option; in 2014 (the most recent data available nationwide), medication abortions accounted for 31% of all nonhospital abortions and for 45% of abortions before nine weeks' gestation. Many of the women who choose this non-invasive option have a very strong preference for it, including those who fear surgery, who find the process more natural, and who want to complete the procedure in the privacy of their own homes or in the presence of a support person or loved ones. This is

particularly true for victims of rape, incest, and domestic violence who often choose medication abortion to feel more in control of the experience and avoid the trauma of having instruments placed in their vagina. There are also women with certain medical conditions for whom medication abortion is medically indicated and safer than surgical abortion.

22. In fact, DHSS has admitted as much, stating in its justification for the Regulation that without medication abortion: "every patient obtaining an abortion would have to obtain a surgical abortion. A surgical abortion would not be in the best medical interest of every patient and could put some patients at unnecessary risk."

23. Plaintiffs provide medication abortion up to ten weeks of pregnancy as dated from the first day of the woman's last menstrual period. Plaintiff RHS provides medication abortion at its health center in St. Louis, and following the entry of a preliminary injunction entered in another case against restrictions barring it from providing abortion at other health centers, it has applications pending with DHSS to provide medication abortion at health centers in Springfield and Joplin. As a result of the same lawsuit, Plaintiff Comprehensive Health obtained a license from DHSS on August 11, 2017, to provide medication abortion at its health center in Kansas City and on October 3, 2017, to provide medication and surgical abortion at its health center in Columbia.

24. Medication abortion has been provided safely to over two million women in the United States alone. A recent, large-scale study showed that only 0.16% of medication abortion patients experienced a significant complication and only six out of every 10,000 patients (0.06%) experienced complications resulting in hospital admission.

25. When rare complications do arise from a medication abortion, they occur after the woman has left the health center, and after she has taken the second medication at a location of

7

Case 2:17-cv-04207-BP   Document 1   Filed 10/30/17   Page 7 of 19

her choosing. Plaintiffs' medication abortion patients receive specific instructions for home care and a phone number for a 24-hour hotline staffed by a nurse. An on-call physician is always available to the nurse for consultation. For the small number of patients who need or want follow-up care, almost all have non-urgent conditions and can return to one of Plaintiffs' health centers for evaluation and if necessary, treatment.

26. In the exceedingly rare case that the patient should need treatment at a hospital or immediate evaluation, Plaintiffs, consistent with the standard of care, will refer her to her local emergency department. Such referrals to the emergency department are common throughout outpatient medicine, even outside the abortion context. Emergency room physicians, and when necessary, on-call ob-gyns, are well qualified to evaluate and treat most complications that can arise after a medication abortion as these complications are the same as those resulting from miscarriage.

**B. Missouri's Repeated Efforts to Bar Abortion Access**

27. Before 2007, DHSS licensed abortion facilities only if they primarily performed surgery, so providers of medication abortion did not need licensure at all. In 2007, Missouri law was changed to require that a facility performing five or more first trimester abortions or one or more second trimester abortion be licensed as an ambulatory surgical center ("ASC"). At that time, DHSS refused to license Comprehensive Health's Kansas City and Columbia health centers, but after Comprehensive Health sued and obtained a preliminary injunction, it entered into a settlement agreement by which it would license the Kansas City health center to provide medication abortion and the Columbia health center to provide medication and surgical abortion. *See Planned Parenthood of Kan. & Mid-Mo. v. Drummond*, No. 07-4164-CV-C-ODS, 2007 WL 2811407, at *2 (W.D. Mo. Sept. 24, 2007).

28. However, due to Missouri's requirements that physicians who provide abortions have local hospital privileges, those health centers were only able to provide abortions some of the time. In 2014, 99% of Missouri counties had no clinics that provided abortions, and 94% of Missouri women lived in those counties. By 2015, RHS's St. Louis health center was the only abortion provider in the entire state. In fact, in late 2015, DHSS took the unusual step (found illegal by this Court) of revoking the Columbia health center's license after its physician lost her local hospital privileges as a result of pressure from the Senate Interim Committee on the Sanctity of Life. *See Planned Parenthood of Kan. & Mid-Mo. v. Lyskowski*, No. 2:15-CV-04273-NKL, 2016 WL 2745873, at *2 (W.D. Mo. May 11, 2016). However, when Comprehensive Health remained unable to locate a physician with local admitting privileges at the end of its license term, it was unable to renew its license.

29. In June 2016, the Supreme Court decided *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), and invalidated Texas's ASC and local hospital privileges restrictions, which are nearly identical to Missouri's. With respect to the admitting privileges requirement, the Court found the Texas restriction "br[ings] about no . . . health-related benefit," because abortion is extremely safe, "with particularly low rates of serious complications." *Id*. at 2311 (internal quotation marks omitted). Specifically, as it relates to medication abortion, the Court noted that admitting privileges would not impact the quality of care the woman received, as any rare complications that do occur do not happen immediately and in such a case, the woman would seek medical attention at the hospital closest to her rather than travel farther to a hospital where a physician has admitting privileges. *Id*. In fact, there was no evidence the requirement would help "even one woman obtain better treatment." *Id*. at 2311–12.

9

Case 2:17-cv-04207-BP   Document 1   Filed 10/30/17   Page 9 of 19

30. Following *Whole Woman's Health*, in the fall of 2016, Plaintiffs brought a lawsuit challenging Missouri's ASC and local hospital privileges requirements. After extensive briefing, expert reports, and discovery, on May 2, 2017, the district court, relying on *Whole Woman's Health*, preliminarily enjoined the local hospital privileges requirement and the portions of the ASC regulations that impose physical facility requirements. Order Granting Prelim. Inj., *Comprehensive Health of Planned Parenthood Great Plains v. Williams*, No. 2:16-CV-04313-HFS, (W.D. Mo. May 2, 2017), ECF No. 97, *appeal filed*, No. 17-1996 (8th Cir.).

31. Plaintiffs were, therefore, able to move forward with the licensure process to provide abortions at their Kansas City, Columbia, Springfield, and Joplin health centers. DHSS, however, has fought that result at every step. It not only appealed the preliminary injunction, but asked both the district court and the U.S. Court of Appeals for the Eighth Circuit to stay the preliminary injunction; both of those requests were denied. It then asked the Eighth Circuit to rehear the stay denial en banc. That request was granted, but after a brief administrative stay, the en banc court, on October 2, 2017, also refused to stay the district court's preliminary injunction.

32. While its petition for rehearing en banc was pending, on August 11, 2017, DHSS provided Plaintiff Comprehensive Health with its abortion facility license to provide medication abortion only at its Kansas City health center. The day after the en banc court denied DHSS's requested stay, on October 3, 2017, it provided Plaintiff Comprehensive Health with its abortion facility license for the Columbia health center. On October 10 and 11, DHSS inspected the Springfield health center. It is awaiting DHSS's report from that inspection, and the Joplin health center is awaiting its inspection.

33. And these are hardly the only restrictions that Missouri has imposed on women's access to abortion. The State requires that before a woman can obtain an abortion, she receive

10

certain state-mandated information in person at least 72 hours before the abortion, necessitating two trips to the health center. Mo. Ann. Stat. §§ 188.027(1), 188.039(2). And that law was recently amended to impose another medically unnecessary requirement that the information be provided by the same physician who will provide the abortion. *Id*. § 188.027(6). Missouri bans providing medication abortion via telemedicine. *Id*. § 188.021(1). It also severely restricts public funding and insurance coverage for abortion. *See* §§ 188.205–215, 376.805(1).

### C. S.B. 5 and the Complication Plan Regulation

34. Following the entry of the preliminary injunction against the local hospital privileges and ASC restrictions, in the summer of 2017, the Missouri Legislature held a special session regarding abortion and enacted Senate Bill 5 ("S.B. 5"), which imposes numerous new restrictions on abortion and took effect on October 24, 2017. S.B. 5, 99th Gen. Assemb., 2nd Extraordinary Sess. (2017 Mo.). A copy of S.B. 5 is attached hereto as Exhibit B. Missouri Senator Andrew Koenig, the main sponsor of S.B. 5 stated publicly that its purpose was to prevent Planned Parenthood from expanding access to abortion to additional health centers in Missouri following the entry of the preliminary injunction in the other litigation. Jason Hancock, *Fate of New Abortion Limits Unclear as Missouri Senators Return to Capitol*, Kan. City Star (July 24, 2017), http://www.kansascity.com/article163000723.html.

35. Relevant to this lawsuit, S.B. 5 prohibits a physician from providing a medication abortion to any patient without first obtaining approval by DHSS of a "complication plan," which must include "any information [DHSS] deem[s] necessary . . . to ensure the safety of any patient suffering complications" from a medication abortion. Mo. Ann. Stat. § 188.021(2). A physician who violates this statute faces criminal liability, and a facility in violation risks loss of its license. Mo. Ann. Stat. § 188.075(1) (class A misdemeanor); *id*. § 197.220(1) (license

11

suspension/revocation if facility's officers violate a criminal abortion statute); *see also id*. § 197.230 (authorizing DHSS to inspect abortion facilities for compliance with abortion statutes).

36. Because S.B. 5 bars Plaintiffs from providing medication abortions as of October 24 unless they had a DHSS-approved complication plan, Plaintiff RHS began reaching out to DHSS about this issue on September 7, and even included a proposed complication plan at that time.

37. On October 2—the same day that the Eighth Circuit refused to stay the preliminary injunction that allows Plaintiffs' health centers outside of St. Louis to become licensed to provide abortions—DHSS issued a memorandum entitled, "Abortion laws effective October 24, 2017." A copy of the October 2 memorandum is attached as Exhibit C. In this memorandum, DHSS explained "[g]enerally" what its new rules for complication plans would include. It stated that medication abortion providers would have to have a written contract with a board-certified or board-eligible obstetrician-gynecologist who has agreed to be "on call and available twenty-four hours a day, seven days a week" to "personally treat all complications" from medication abortion "except in any case where doing so would not be in accordance with the standard of care or the patient's best interest for a different physician to treat her." The memorandum also stated that the contracted ob-gyn physician would be required to "[a]ssess each patient individually and shall not, as a matter of course, refer all patients to the emergency room or other facilities or physicians unless the patient is experiencing an immediately life-threatening complication." The memorandum did not mention any requirement that the contracted physician have admitting privileges or any geographic limitation on the contracted physician.

38. On October 16, both RHS and Comprehensive Health submitted complication plans consistent with the October 2 memorandum's requirements for DHSS's approval. In addition to outlining their protocols for medication abortion patients, the plans identify backup ob-gyns to ensure 24/7 coverage. DHSS rejected these plans.

39. Comprehensive Health submitted a revised plan on October 23, clarifying that the on-call physician would be an ob-gyn and that an ob-gyn would personally treat any patient returning to the health center during office hours. DHSS again would not approve the plan.

40. RHS also submitted a revised complication plan for its St. Louis health center on October 23, attaching its agreement with a local ob-gyn group. Later that day, with medication abortion procedures scheduled the next day, DHSS approved the complication plan for the St. Louis facility.

41. On October 24, DHSS promulgated the Complication Plan Regulation as an emergency administrative rule, to be effective on November 3, 2017, as Mo. Code Regs. Ann. tit. 19 § 30-30.061.[1] The Regulation was largely the same as DHSS's October 2 memorandum, establishing its requirements for the complication plans required by S.B. 5. At the same time, DHSS promulgated an identical Complication Plan Regulation as a proposed rule, to be effective after the notice-and-comment period runs. Later that same day, Comprehensive Health submitted a third plan, which further clarified that an ob-gyn would be available 24/7 to personally treat complications related to medication abortion. DHSS would not approve this plan either.

42. By October 26, DHSS made clear for the first time that it was requiring that each complication plan include a contract with a local ob-gyn physician who has hospital privileges

---

[1] Although the emergency regulation does not technically take effect until November 3, S.B. 5 required a complication plan approved by DHSS be in place by October 24 to provide medication abortion.

13

near the abortion facility, which has not been possible for the Columbia health center (which DHSS knew based on prior litigation). Therefore, on October 26, Comprehensive Health submitted another revised complication plan solely for its Kansas City health center. The revisions made clear that Comprehensive Health's Medical Director—who is an ob-gyn and who has admitting privileges at a local hospital—is available 24/7 to personally treat complications related to medication abortions provided at the Kansas City health center. DHSS again did not approve the plan, stating for the first time its position that both the Kansas City ob-gyn provider and the backup ob-gyn provider must maintain admitting privileges at a full-service, acute care hospital located near the Kansas City health center and that the Kansas City ob-gyn provider would have to be available to treat complications 24/7 when the Medical Director was unavailable. Comprehensive Health's physicians maintain those admitting privileges not because they are medically necessary, but because of these types of medically unnecessary state laws. On October 27, Comprehensive Health made additional edits to its proposed plan based on those new requirements. DHSS finally approved the Kansas City complication plan, preventing cancellation of the Kansas City health center's patients scheduled for a procedure on Monday, October 30.

43. Also on October 26, Comprehensive Health reminded DHSS that, in addition to its protocols, it had an existing written transfer agreement between its Columbia health center and a local hospital, which provides that the hospital will accept and treat any of Comprehensive Health Columbia patients who require follow-up care in a hospital setting. DHSS still would not approve Comprehensive Health's plan for the Columbia health center.

44. Although S.B. 5, DHSS's October 2 memorandum, and DHSS's emergency and administrative rules do not mention admitting privileges at all, and certainly not local admitting

14

privileges—a requirement that has both been invalidated by the Supreme Court and which Missouri already has but is preliminary enjoined in another lawsuit—DHSS is now refusing to approve any complication plan unless the contracted ob-gyn physician (or ob-gyn group) has admitting privileges near the health center where the abortion is performed and agrees to "personally treat" all women who need any follow up care in the same city where the woman received the first medication.

### D. The Effect of the Regulation on Plaintiffs and Their Patients

45. Because Plaintiffs are unable to find local board-certified or board-eligible ob-gyns (or ob-gyn groups)—let alone ones who have admitting privileges—who are willing to "personally treat" their patients "twenty-four hours a day, seven days a week" in Columbia, Joplin, or Springfield, the effect of the Complication Plan Regulation is to ban medication abortion in those three cities. Because the Joplin and Springfield health centers' pending licensure applications are to provide only that service, the Regulation will bar abortion entirely in those cities. And because Kansas City's approved plan is contingent on the fact that their current physicians who provide abortion have been able to maintain local admitting privileges, Kansas City is at risk of being unable to provide abortions if those physicians are unable to maintain those privileges and/or if those physicians ever stop providing that service.

46. The Regulation harms women's health by restricting access to medication abortion to only two abortion facilities located on either end of the state: one in St. Louis and one in Kansas City. Women from anywhere outside of those two areas must travel significant distances to obtain a medication abortion in their home state. And due to other Missouri abortion restrictions, they must make this trip two times, at least 72 hours apart, and meet in person with the same physician who is going to provide the abortion.

15

47. In some cases, women will be unable to obtain abortions at all because of the lack of access and the difficulty and expense of traveling a long distance to a provider caused by the Regulation. For other women, they will be denied the ability to get a medication abortion, which they may prefer for extremely personal and significant reasons, or which may be medically indicated, as DHSS has admitted. For still other women who are able to access abortion, the travel required will increase the cost and logistical difficulty of reaching a provider and therefore delay the abortion, as well as causing the woman to miss additional work, childcare, and other obligations; incur additional expenses; and, in some cases, jeopardize the confidentiality of her pregnancy and/or abortion decision. Although abortion is one of the safest procedures in contemporary medicine, the risk of complications (as well as the cost of the procedure) increases as the pregnancy advances.

48. These burdens are placed on Plaintiffs' patients without any corresponding health benefit. Plaintiffs' existing practices and protocols are consistent with the standard of care. As the American College of Obstetricians and Gynecologists, the leading group of physicians who provide health care to women, has stated: a requirement that physicians who provide medication abortion have a contract with a backup physician with hospital admitting privileges "does nothing to enhance the quality or safety of abortion care, and in fact creates a grave risk to public health." *See* Br. of *Amici Curiae* Am. Public Health Ass'n & Am. Coll. of Obstetricians & Gynecologists in Supp. of Appellees 3, *Planned Parenthood of Ark. & E. Okla. v. Jegley*, No. 16-2234 (8th Cir. Nov. 10, 2016).

49. The Regulation singles out medication abortion and its providers for different and more burdensome treatment than all other patients or health care providers regulated by the State, including countless medical procedures that are much riskier and for which complications

are much more prevalent than medication abortion. The Complication Plan Regulation's differential treatment of medication abortion as compared to all other health care is not rationally related to the promotion of women's health or to any other important or legitimate governmental interest, especially in light of how safe abortion is compared to other procedures.

50. The Regulation, and DHSS's arbitrary and capricious interpretation of it, also harms Plaintiffs by preventing them from pursuing their businesses and professions, and frustrating their missions to provide comprehensive reproductive health care to Missouri women.

51. The Complication Plan Regulation violates Plaintiffs and their patients' constitutional rights and will cause—and is already causing—irreparable harm to both Plaintiffs and their patients.

52. Plaintiffs and their patients have no adequate remedy at law.

## CLAIMS FOR RELIEF

### COUNT I
### (Substantive Due Process—Right to Privacy)

53. Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 52 above.

54. Missouri's Complication Plan Regulation violates Plaintiffs' patients' right to liberty and privacy as guaranteed by the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. It is an unnecessary health regulation that has the purpose and effect of imposing an undue burden on women's right to choose abortion.

### COUNT II
### (Equal Protection)

55. Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 54 above.

56. Missouri's Complication Plan Regulation violates Plaintiffs' and their patients' rights under the Equal Protection Clause of the Fourteenth Amendment to U.S. Constitution by treating Plaintiffs and their patients differently from other similarly situated health care providers and patients without a sufficient state interest.

## COUNT III
**(Procedural Due Process)**

57. Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 56 above.

58. Defendants' arbitrary and capricious interpretation and enforcement of Missouri's Complication Plan Regulation violates Plaintiffs' and their patients' rights under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Issue a declaratory judgment that Missouri's Complication Plan Regulation, Mo. Code Regs. Ann. tit. 19, § 30-30.061 is unconstitutional;

B. Issue preliminary and permanent injunctive relief, without bond, preventing Defendants, their employees, agents, and successors in office from enforcing Missouri's Complication Plan Regulation, Mo. Code Regs. Ann. tit. 19, § 30-30.061;

C. Issue preliminary and permanent relief, without bond, preventing Defendants, their employees, agents, and successors in office from enforcing Mo. Ann. Stat. § 188.021(2), insofar as Plaintiffs cannot provide medication abortion without approval of a complications plan that meets DHSS's interpretation of the Complication Plan Regulation;

D. Grant Plaintiffs' attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988; and/or,

E. Grant such further relief as this Court deems just and proper.

Dated: October 30, 2017

        Respectfully submitted,

        ARTHUR BENSON & ASSOCIATES

        By: s/ Arthur A. Benson II

        By: s/ Jamie Kathryn Lansford
        Arthur A. Benson II #21107
        Jamie Kathryn Lansford #31133
        4006 Central Avenue
        Kansas City, MO 64111
        Phone: (816) 531-6565
        Fax: (816) 531-6688
        abenson@bensonlaw.com
        jlansford@bensonlaw.com

        and

        PLANNED PARENTHOOD FEDERATION
        OF AMERICA

        Richard Muniz*
        Carrie Y. Flaxman*
        Helene T. Krasnoff*
        Planned Parenthood Federation of America
        1110 Vermont Avenue, NW Suite 300
        Washington, DC 20005
        Phone: (202) 973-4800
        Fax: (202) 296-3480
        richard.muniz@ppfa.org
        carrie.flaxman@ppfa.org
        helene.krasnoff@ppfa.org

        *Attorneys for Plaintiffs*

        * *Pro hac vice motion forthcoming*