# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

| | |
|---|---|
| COMPREHENSIVE HEALTH OF PLANNED PARENTHOOD GREAT PLAINS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> RANDALL W. WILLIAMS, MD, in his official capacity as Director of the Missouri Department of Health and Senior Services, et al., <br><br> Defendants. | Case No. |

**DECLARATION OF COLLEEN P. McNICHOLAS, DO, MSCI, FACOG, IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**

Colleen P. McNicholas, DO, MSCI, FACOG, declares the following:

1. I am a board-certified obstetrician-gynecologist ("og-gyn"). I am also an Assistant Professor in the Department of Obstetrics and Gynecology at the Washington University School of Medicine, Director of the Ryan Residency Training Program, and Attending Physician at Barnes-Jewish Hospital in St. Louis, Missouri. As part of my varied patient care, I provide abortions for Comprehensive Health of Planned Parenthood Great Plains ("Comprehensive Health") at its Columbia health center. I also provide abortion services at Reproductive Health Services of Planned Parenthood of the St. Louis Region ("RHS") and as part of an ob-gyn specialist group practice. I attach a copy of my curriculum vitae as Exhibit 1.

2. I understand that Missouri Senate Bill 5 ("S.B. 5") amends and adds to numerous existing statutory and regulatory requirements that must be met before an abortion may be performed in the state of Missouri. S.B. 5, 99th Gen. Assemb., 2d Extraordinary Sess. (Mo. 2017). I further understand that a part of S.B. 5, codified at Mo. Stat. Ann. § 188.021(2),

prohibits a physician from providing a medication abortion to any patient without first obtaining approval of a "complication plan" from the Department of Health and Senior Services ("DHSS"), which must include "any information [DHSS] deem[s] necessary . . . to ensure the safety of any patient suffering complications" from a medication abortion. I also understand that knowingly violating § 188.021(2) is a Class A misdemeanor. Mo. Stat. Ann. § 188.075(1).

3.      I understand that on October 24, 2017, when S.B. 5 took effect, DHSS released an emergency rule. The emergency rule states that "[e]very complication plan shall provide that an ob-gyn is on-call and available twenty-four hours a day, seven days a week (24/7)" who will "assess each patient suffering a complication individually" and "personally treat all complications" related to medication abortion "except in any case where doing so would not be in accordance with the standard of care, or in any case where it would be in the patient's best interest for a physician to treat" the patient. I understand the rule also states that the contracted ob-gyn physician would be required to "[a]ssess each patient individually and shall not, as a matter of course, refer all patients to the emergency room or other facilities or physicians unless the patient is experiencing an immediately life-threatening complication." Mo. Dep't Health & Senior Servs., *Complication Plans for Certain Drug- and Chemically-Induced Abortions Via Abortion Facilities* (Oct. 24, 2017) (to be codified at Mo. Code Regs. Ann. tit 19 § 30-30.061), http://health.mo.gov/safety/abortion/pdf/admin-rules.pdf, ("Complication Plan Regulation" or the "Regulation").

4.      The emergency rules do not mention hospital admitting privileges at all. Nor do they mention where the backup ob-gyn must be located. I understand, however, that DHSS is nonetheless requiring a written agreement between the abortion facility and a local ob-gyn (or ob-gyn group) who has admitting privileges at a local hospital, and that as a result, DHSS has

2

refused to approve the Columbia health center's complication plan. As result, Comprehensive Health's Columbia health center cannot provide medication abortions to our patients, absent a temporary restraining order. I submit this declaration in support of Plaintiff's Motion for Temporary Restraining Order.

## MEDICATION ABORTION BACKGROUND

5.     Legal abortion is one of the safest procedures in contemporary medical practice. Abortion complications are exceedingly rare: nationwide, fewer than one-quarter (0.23%) of 1% of all abortion patients (all procedures and gestational ages) experience a complication that requires hospital admission, surgery, or blood transfusion.[1] Approximately one in four women in this country will have an abortion by age 45.

6.     There are generally two methods of performing abortions: medically, by administering certain drugs, or surgically, using various instruments. The former method is known as "medication abortion."

7.     Medication abortion safely and effectively terminates a pregnancy non-surgically through a combination of two prescription pills: mifepristone and misoprostol. Mifepristone (also known as "RU-486" or by its commercial name, Mifeprex) works by blocking the hormone progesterone, which is necessary to maintain a pregnancy, and by increasing the efficacy of the second medication in the regimen, misoprostol. Misoprostol (known commercially as Cytotec) causes the uterus to contract and expel its contents similar to a miscarriage, generally within hours, thereby completing the abortion.

8.     Comprehensive Health (and abortion providers around the country) provides medication abortion according to the regimen that now appears on the Mifeprex label approved

---

[1] Ushma D. Upadhyay et al., *Incidence of Emergency Department Visits and Complications After Abortion*, 125 Obstet. & Gynecology 175, 179 tbl.3. (2015).

Case 2:17-cv-04207-BP   Document 4-1   Filed 10/30/17   Page 4 of 25

by the U.S. Food and Drug Administration in March 2016. Under that regimen, a patient takes 200 mg of mifepristone at a health care facility, and approximately 24 to 48 hours later, at a comfortable location of her choosing, takes 800 micrograms ("μg") of misoprostol. This regimen is offered to a woman through 70 days, or 10 weeks, after the first day of the woman's last menstrual period.

9.     Medication abortion is an increasingly popular choice; in 2014 (the most recent data available nationwide), medication abortions accounted for 31% of all nonhospital abortions and for 45% of abortions before nine weeks' gestation.[2] The proportion of medication abortion has been increasing over time, and overall numbers are likely to continue increasing. Since the approval of Mifeprex in 2000, more than 2 million American women have safely had a medication abortion.

10.     Many of these women have a very strong preference for a procedure using medications alone.[3] For some women, medication abortion offers important advantages over surgical abortion. Many women prefer medication abortion because they can complete the process in the privacy of their homes, with the company of loved ones, at a time of their choosing, and because it feels more natural, like a miscarriage.

11.     Some women choose medication abortion because they fear a procedure involving surgical instruments. Victims of rape, or women who have experienced sexual abuse or molestation, may choose medication abortion to feel more in control of the experience and to avoid trauma from having instruments placed in their vagina.

---

[2] Rachel K. Jones & Jenna Jerman, *Abortion Incidence and Service Availability in the United States, 2014*, 49 Persps. on Sexual & Reprod. Health 17, 21–22 (2017).

[3] *See* Daniel Grossman et al., *Effectiveness and Acceptability of Medical Abortion Provided Through Telemedicine*, 118 Obstet. Gynecol. 296, 300 (2011) (finding 71% of study participants said they strongly preferred medication abortion).

4

12.     For other women, there are medical reasons why medication abortion is better for them than surgical abortion. Some women have medical conditions that make medication abortion a significantly safer option, with a lower risk of complications and failure than surgical abortion. These conditions include anomalies of the reproductive and genital tract, such as large uterine fibroids, female genital mutilation, vaginismus, or cervical stenosis, as well as severe obesity or an extremely flexed uterus, all of which make it difficult to access the pregnancy inside the uterus as part of a surgical abortion.

13.     This is consistent with my own personal experience in which I have spoken to patients who have expressed a strong preference for medication abortion. Some are afraid of a surgical procedure. Others feel that a medication abortion is more natural than a surgical abortion and is more like a miscarriage. Still others want to complete the procedure in the privacy of their own homes or in the presence of a support person or loved ones.

## SAFETY OF MEDICATION ABORTION

14.     Medication abortion is one of the safest procedures in contemporary medical practice. It does not require anesthesia or sedation. Major complications from medication abortion are extremely rare, and far rarer than those associated with pregnancy and childbirth. Many women take only over-the-counter medication to control whatever pain they experience.

15.     Complications that may follow a medication abortion occur only after the patient has left the health center and is at home. The types of complications that may occur following medication abortion include infection, bleeding, and retained tissue. In the vast majority of cases, these types of complications can be, and are, handled in an outpatient setting without the need for emergent care or any hospital treatment.

5

16.     Recent studies demonstrate the safety of medication abortion. For instance, one large study found that the risk of major complications from medication abortions—defined as serious unexpected adverse events requiring hospital admission, surgery, or blood transfusion—was 0.31%.[4] Another study found that among over 19,000 medication abortions (in-person or via telemedicine), only 0.26% experienced clinically significant adverse events—defined as treatment given in an emergency department, hospital admission, surgery, blood transfusion, and death.[5] One recent, large-scale study showed that only 0.16% of medication abortion patients experienced a significant complication (defined as hospital admission, blood transfusion, emergency department treatment, intravenous antibiotics administration, infection, and death), and only six out of every 10,000 patients (0.06%) experienced complications resulting in hospital admission.[6]

17.     By contrast, the risk of maternal mortality associated with live birth is approximately fourteen times higher than that of induced abortion. Moreover, the relative morbidity of every pregnancy-related complication (ranging from mental health conditions to postpartum hemorrhage) is more common in live birth.

18.     Medication abortion will fail or be incomplete in less than 2.0% of cases.[7] Of the small percentage of women having any complication from medication abortion, by far the most common is an incomplete abortion, which happens if some tissue is retained in the uterus, which can cause continued bleeding or spotting. This will, of course, occur away from the health center

---

[4] Upadhyay et al., *supra* note 1, at 178 tbl.3.

[5] Daniel Grossman & Kate Grindlay, *Safety of Medical Abortion Provided Through Telemedicine Compared with In Person*, 130 Obstet. & Gynecology 778, 780 (2017).

[6] Kelly Cleland et al., *Significant Adverse Events and Outcomes After Medical Abortion*, 121 Obstet. & Gynecology 166, 169 tbl.2 (2013).

[7] Daniel Grossman et al., *Effectiveness and Acceptability of Medical Abortion Provided Through Telemedicine*, 118 Obstet. & Gynecology 296, 300 tbl.2 (2011).

where the mifepristone is taken, as any bleeding or spotting generally will not start until after the second medication is taken the next day or two at a location of the woman's choosing. If the abortion is not complete or has failed, the patient has the option to take a second dose of misoprostol in the hope of completing the abortion, to have an aspiration procedure similar to a surgical abortion or miscarriage management, or in some cases, to wait for the tissue to pass.

19.     In the rare event that a woman elects to or needs to have an aspiration procedure to remove retained tissue or complete the abortion, it does not need to be performed immediately and does not need to be performed at the same health center where she took the mifepristone. She can be scheduled for the procedure, generally within the next few days, at another health center or doctor's office.

20.     All other possible complications following medication abortion are even rarer and would never occur at the health center, but rather long after the woman has left. For example, in the extremely rare case that a medication abortion patient has experienced sufficient blood loss that she might need emergency treatment (such as a transfusion or fluid support), it will typically occur one to three weeks after the procedure. And the protocol in such a situation is the same as in any outpatient setting; when the patient phones the outpatient facility to report the heavy bleeding, advise her to go to the nearest emergency room (or, if she came in person to the health center rather than telephoning, transfer her to the hospital). She would not be treated at the health center even if it offered surgical abortion.

**TREATMENT OF MEDICATION ABORTION-RELATED COMPLICATIONS**

21.     The Complication Plan Regulation's stated objective is to ensure continuity of care and communication between the abortion provider and the physician(s) who will treat a patient's complication. Comprehensive Health's policies already meet these objectives.

7

22.     As required by Planned Parenthood's Medical Standards & Guidelines, as well as by Comprehensive Health's policies, all Planned Parenthood abortion patients receive detailed instructions on what to expect during the medication abortion, including what level of bleeding or other symptoms constitute cause for concern, as well as a twenty-four hour, seven days per week hotline to call with any questions or concerns. This number is staffed by a nurse, and an on-call physician is always available for consultation.

23.     Most commonly, once the patient explains her symptoms it becomes clear that they can be addressed by phone, with reassurance that the bleeding or cramping they are experiencing is not cause for concern. If further evaluation is needed, most patients can wait to come to the closest Planned Parenthood health center during business hours, and most symptoms can be appropriately treated at that time. Thus, the Regulation's requirement of a local privileged ob-gyn would provide no benefit to these patients.

24.     In the very rare case that the on-call nurse (or on-call physician) determines the patient should be evaluated immediately, he or she will direct the patient to the closest emergency room with certain instructions, including taking post-care paperwork so hospital staff know she had a medication abortion and can contact Comprehensive Health with any questions. Health center staff subsequently telephones the patient to ascertain whether she went to the emergency room and what care (if any) she received and determine whether any further follow-up is appropriate.

25.     If an emergency room physician decides that it is necessary to involve an ob-gyn in the patient's care, he or she will contact the ob-gyn on call at that hospital who can admit the patient if necessary. Complications from medication abortion are similar to those from miscarriages, which emergency departments deal with every day. In addition, every hospital has

8

an obligation under a federal law called the Emergency Medical Treatment and Labor Act (EMTALA) to provide emergency treatment to any patient who arrives at the hospital. Thus, if a patient experiencing a complication is brought to a hospital or subsequently seeks care at a hospital, that patient would receive the necessary care there regardless of whether the abortion facility has an agreement with an ob-gyn or ob-gyn group with privileges at the hospital.

26.     All of what I have described is typical of the way follow-up care is commonly— and safely—provided for a wide range of outpatient procedures. It is standard medical practice.

### THE REGULATION IS MEDICALLY UNNECESSARY

27.     The Complication Plan Regulation is medically unnecessary and by limiting access to medication abortion—an extremely safe, non-invasive method of early abortion—it will actually harm women's health. As I detail above, it is not in accordance with the standard of care, which does not require that an identified ob-gyn be "on call and available twenty-four hours a day, seven days a week" to "personally treat all complications" from medication abortion.

28.     DHSS's interpretation of the Regulation (which does not appear in its text) that the contracted ob-gyn physician have admitting privileges at a nearby hospital and who will agree to personally treat all complications is even further far afield. In fact, given that the effect of the DHSS's interpretation will be to make it impossible to offer medication abortion in Columbia, it makes no medical sense: Women near that health center who want a medication abortion will now have to travel hundreds of miles to St. Louis or Kansas City to get a medication abortion, but their complications will occur near Columbia. And then what? The complication plans for the St. Louis and Kansas City health centers, which have been approved by DHSS, will still require that they be sent to a Columbia-area emergency department as even DHSS seems to agree that it would not be in their best interest to travel back to St. Louis or

9

Kansas City to be seen by the ob-gyn identified in the complication plan. So those women are in the *exact* same situation as they would be without the Regulation except that they need to travel hundreds of miles to obtain a medication abortion rather than obtaining the medications locally.

29. Second, as noted above, the most common "complications" from medication abortion do not require urgent care or hospital treatment. That is because those patients experiencing incomplete or failed abortions have the option to take a second dose of misoprostol, have an aspiration procedure, or in some cases of incomplete abortion, wait for the tissue to pass. When a patient elects or needs to have a surgical procedure to complete the abortion, it need not be performed immediately, and the patient can return to a Planned Parenthood health center to complete the abortion. The local privileged ob-gyn requirement would not aid patients in these situations.

30. The Regulation's requirement that the backup provider, with whom the patient does not have a physician-patient relationship, "arrange for hand-off of the patient" to an emergency room physician also makes little medical sense. If a hospital physician needs further information or expertise in the treatment of medication abortion complications (and in my opinion, they do not because hospital physicians are able to care for medication abortion patients, as they frequently see identical complications resulting from spontaneous miscarriage), the abortion provider, who has the most recent, pertinent knowledge concerning the patient's medication abortion is best suited to directly communicate with the emergency department.

31. Interjecting this intermediate step in the patient's care is not in the patient's best interest. For instance, some patients, such as those who need immediate evaluation at a hospital, but who are not "experiencing an immediately life-threatening complication," the requirement

will delay treatment while the patient waits to be assessed by a local privileged ob-gyn before transfer to an emergency department can occur.

32.    Finally, whether an ob-gyn has local admitting privileges with a nearby hospital makes no difference to the care an abortion patient would receive there. For one, the Regulation does not require the local privileged ob-gyn to personally treat a complication where "surgery in a hospital is required." And in any event, emergency room physicians are well qualified to evaluate and treat most complications that can arise after a medication abortion, as these complications are identical to those suffered by women experiencing miscarriage who receive treatments in hospitals every day through emergency room physicians and on-call specialists, if necessary.

33.    For these reasons, the practice guidelines of the leading professional organization of ob-gyns, the American Congress of Obstetricians and Gynecologists ("ACOG"), Planned Parenthood Federation of America, and the leading professional organization of abortion providers, the National Abortion Federation ("NAF"), recognize that clinics that perform abortions should have arrangements in place for transferring patients who require emergency treatment, but do not suggest or require that abortion-providing physicians have contracts with ob-gyns to be on call 24/7 and "personally treat" all complications. Nor do they require agreements with local ob-gyns who have admitting privileges at a nearby hospital. For example, ACOG states: Clinicians who perform abortions "in their offices, clinics, or freestanding ambulatory care facilities should have a plan to ensure prompt emergency services if a complication occurs and should establish a mechanism for transferring patients who require

11

emergency treatment."[8] NAF states: "Protocols for the management of medical emergencies must be in place. These protocols must include indications for emergency transport and written, readily available directions for contacting external emergency assistance (e.g., an ambulance),"[9] and that, "[h]ospital admitting privileges are not needed to provide safe abortion care."[10]

34.    Physicians, without hospital privileges, transfer agreements, or agreements with other physicians with local privileges can and do safely perform procedures that are much more complex and invasive than medication abortion at offices, clinics, and outpatient facilities. These procedures include colonoscopy, hysteroscopy, endometrial ablation, loop electrical excision of precancerous cervical lesions (LEEP), and wide excisions of skin cancers.

### THE COMPLICATION PLAN REGULATION'S EFFECT ON PATIENTS

35.    For patients of the Columbia health center, the closest Planned Parenthood health center—and indeed the only abortion facility in central Missouri—is the Columbia facility. And although I am an ob-gyn who has admitting privileges in St. Louis (which is unnecessary for the safe provision of abortion care), DHSS nevertheless will not allow the facility to provide medication abortion. Thus, the immediate effect of the Complication Plan Regulation, as DHSS is enforcing it, is a ban of medication abortions in Columbia, which patients may prefer for extremely personal and significant reasons, or which may be medically indicated.

36.    The Regulation thus forces patients who would otherwise obtain medication abortion services at Columbia to travel hundreds of miles to either St. Louis or Kansas City for

---

[8] ACOG, *Guidelines for Women's Health Care: A Resource Manual* 720(2014); *see also* ACOG, *Statement on State Legislation Requiring Admitting Privileges for Physicians Providing Abortion Services*, Apr. 25, 2013, https://www.acog.org/About-ACOG/News-Room/News-Releases/2013/Hospital-Admitting-Privileges-for-Physicians-Providing-Abortion-Services.

[9] NAF, 2016 Policy Guidelines 51 (2016).

[10] *Id*. at 1.

12

that care. And due to other Missouri abortion restrictions, they must make this trip two times, at least 72 hours apart, and meet in person with the same physician who is going to provide the abortion.

37.     In 2014, 99% of Missouri counties had no clinics that provided abortions, and 94% of Missouri women lived in those counties.[11] The travel required to obtain an abortion will increase the cost and logistical difficulty of reaching a provider and therefore delay the abortion, as well as causing the woman to miss additional work, childcare, and other obligations; incur additional expenses; and, in some cases, jeopardize the confidentiality of her pregnancy and/or abortion decision. Although abortion is one of the safest procedures in contemporary medicine, the risk of complications (as well as the cost of the procedure) increases as the pregnancy advances. In these ways, the Regulation actually harms women's health rather than promoting it. In fact, the Regulation serves no medical purpose, and only serves to burden women seeking a safe, early, non-surgical abortion.

I declare under penalty of perjury the foregoing is true and correct.

Dated: October 30, 2017

*s/ Colleen P. McNicholas*
Colleen P. McNicholas, DO, MSCI, FACOG

---

[11] Jones & Jerman, *supra* note 2, at 23 tbl.4.

# EXHIBIT 1

## CURRICULUM VITAE
## Colleen Patricia McNicholas, DO, MSCI, FACOG

**Date:**                        September 2017

**Address:**

Department of Obstetrics and Gynecology
Washington University in St. Louis
Campus Box 8219
Division of Clinical Research
4533 Clayton Ave
St. Louis, Missouri 63110-1094

**Present Position:**

Assistant Professor
Washington University School of Medicine in St. Louis
Department of Obstetrics and Gynecology
Division of Family Planning

Director -Ryan Residency Training Program
Washington University School of Medicine in St. Louis

Director- Ryan Residency Collaborative
Oklahoma University and Washington University School of Medicine

Assistant Director- Fellowship in Family Planning
Washington University School of Medicine in St. Louis

**Education:**

| | | |
|---|---|---|
| <u>Undergraduate:</u> | 1998-2003 | Benedictine University<br>Lisle, Illinois<br>B.S. Forensic Chemistry |
| <u>Graduate:</u> | 2003-2007 | Kirksville College of Osteopathic Medicine<br>Kirksville, Missouri<br>Doctor of Osteopathy |
| | 2011-2013 | Washington University in St. Louis<br>St. Louis, Missouri<br>Masters of Science in Clinical Investigation |
| <u>Internship:</u> | 2007-2008 | Atlanta Medical Center<br>Atlanta, Georgia<br>Internship |
| <u>Residency:</u> | 2008-2011 | Washington University School of Medicine<br>Residency in Obstetrics and Gynecology |
| <u>Fellowship:</u> | 2011-2013 | Washington University School of Medicine<br>Clinical Instructor – Obstetrics and Gynecology<br>Clinical Fellow – Family Planning |

**Academic Positions/Employment:**

| | | |
|---|---|---|
| | 2013- | Assistant Professor<br>Department of Obstetrics and Gynecology<br>Washington University School of Medicine |

|            |           | 2012-2014 | Missouri Baptist Medical Center, St Louis, MO |
|            |           |           | Laborist |

**University and Hospital Appointments and Committees:**

*Appointments*

2013-      Attending Physician
Barnes Jewish Hospital
St. Louis, MO

2014-      Director, Ryan Residency Training Program
Department of Obstetrics and Gynecology
Washington University School of Medicine

2016-      Assistant Director, Family Planning Fellowship
Department of Obstetrics and Gynecology
Washington University School of Medicine

2016-      Obstetrics and Gynecology Performance Evaluation Committee
Washington University/Barnes Jewish OB/GYN Residency

2016-      Washington University School of Medicine
Institutional Review Board
Member

*Committees:*

2014- 2017    American College of Obstetrics and Gynecology
2017-2020    Committee on the Healthcare for Underserved Women
Member

2015- 2017    American College of Obstetrics and Gynecology
2017-2020    Committee on Adolescent Health Care
Underserved Committee Liaison

2015-      International Federation of Gynecology and Obstetrics (FIGO)
Women's Sexual and Reproductive Rights Committee
Master Trainer, Integrating Human Rights in Health

2016-      Ibis Reproductive Healthcare
Over the counter oral contraceptive working group
Policy Subcommittee

2017-      MERCK Global Advisory Board on Contraception

2017-      Washington University School of Medicine
OUT Med Advisory Board

*Volunteer*    2015-      Saturday Neighborhood Health Clinic
Washington University School of Medicine
Volunteer Attending Physician Faculty, Primary Care
Volunteer Attending Physicain Faculty, OB/GYN Clinic
Volunteer Attending Physician Faculty, Americore Homeless

**Medical Licensure and Board Certification:**
*Licensure*
       Missouri, Kansas, Oklahoma

Board Certification:
| | |
|---|---|
| 2014- current | American Board of Obstetrics and Gynecology |
| | General Obstetrics and Gynecology |
| | Diplomate |

**Honors and Awards**:

| | |
|---|---|
| 2001 | Gregory Snoke Memorial Scholarship |
| 2001 | American Chemical Society Analytical Achievement Award |
| 2001 | American Chemical Society Division of Analytical Chemistry 2001 Undergraduate Award |
| 2002 | PGG Industries Foundation J. Earl Burrell Scholarship |
| 2003 | Senior Academic Award: College of Arts and Science |
| 2006 | Presidents Award: Women in Medicine |
| 2011 | Kody Kunda Resident Teaching Award |
| 2012 | ACOG Health Policy Rotation, LARC Program January 2013 |
| 2012 | Physicians for Reproductive Health and Choice (PRCH) Leadership Training Academy |
| 2012 | President's Award: St. Louis Gynecologic Society, best research presentation |
| 2016 | Fellowship in Family Planning, Warrior Award |
| 2016 | Physicians for Reproductive Health, Voices of Courage: A Benefit Celebrating Extraordinary Abortion Providers |
| 2016 | 2015 Roy M. Pitkin Award, Obstetrics and Gynecology (The Green Journal) |

**Editorial Responsibilities:**

| | |
|---|---|
| 2011- | *Reviewer*, Contraception |
| 2011- | *Reviewer*, Journal of Family Planning and Reproductive Health Care |
| 2012- | *Reviewer*, American Journal of Obstetrics and Gynecology |
| 2012- | *Reviewer*, European Journal of Obstetrics and Gynecology and Reproductive Biology |
| 2013- | *Reviewer*, Obstetrics and Gynecology |

**Professional Societies and Organizations:**

| | |
|---|---|
| 2003- | Medical Students for Choice |
| 2006-2011 | Association of Reproductive Health Professionals |
| 2006- | American Congress of Obstetricians and Gynecologists |

*Leadership Roles*

- 2013: The American College of Obstetricians and Gynecologists/Bayer HealthCare Pharmaceuticals Research Fellowship in Contraceptive Counseling (Selection committee)

- 2012-2015: American Congress of Obstetrics and Gynecology Congressional Leadership Conference
  - 2015: Presenter, Reproductive Health Legislation in the States
  - 2016: Presenter, Reproductive Health Legislation in the States

- 2014-2019: Committee on Health Care for Underserved Women
  - Author, CO-Healthcare for Women with Disabilities
  - Author, Policy statement- Marriage and Family Equality
  - ACOG Liason, AAMC Family Building Webinar series

- 2015-2018: Committee on Adolescent Health Care, Underserved Liaison

- 2015-current: Missouri ACOG Section Advisory Committee, Member
  - 2015- current: Member, Legislative Committee

| | |
|---|---|
| 2006- | Gay and Lesbian Medical Association |
| 2006- | Women in Medicine |
| | *Leadership Roles* |

- 2010-current Board Member
- 2016: Chair of annual conference, Aug 2016

2008-2011    St. Louis Obstetrics and Gynecology Society

*Leadership Roles*

- Resident Board Member

2011-    Society of Family Planning

**Invited Presentations:**

| | |
|---|---|
| 2001 | Cadmium's effect on Osteoclast Apoptosis |
| | 12th Annual Argonne Symposium for Undergraduates in Science, Engineering and Mathematics |
| | |
| 2002 | Cadmium's effect on Osteoclast Apoptosis |
| | 2002 Experimental Biology Conference |
| | |
| 2012 | Contraception for medically complicated women |
| | Women in Medicine Annual meeting |
| | |
| 2013 | The troubling trend of legislative interference. |
| | Washington University School of Medicine, OBGYN Grand Rounds. |
| | |
| 2013 | An update on abortion: Why lesbians and those who treat them should care |
| | The Gay and Lesbian Medical Association |
| | |
| *2013* | Findings from the Contraceptive CHOICE Project. Are you meeting your patient's contraceptive needs? |
| | Washington University School of Medicine Annual OB/GYN Symposium |
| | |
| 2013 | Legislative interference and the impact on public health. |
| | Washington University Brown School of Social Work. |
| | |
| 2014 | Business of Medicine Medical Student Elective Course |
| | Legislating Medicine |
| | Washington University School of Medicine |
| | |
| 2014 | Practical tips for your first RCT, lessons learned |
| | Lecture in Randomized Control Trial course |
| | |
| 2014 | Uniting tomorrow's leaders of the RJ movement with providers of today |
| | National Abortion Federation Annual Meeting |
| | |
| 2014 | Systems based practice and advocating for your patients |

Washington University School of Medicine OB/GYN residency core lecture

2014    Abortion in sexual minority populations
        *National Abortion Federation*

2014    Complications of uterine evacuation
        St. Louis University OB/GYN Grand Rounds

*2014*  Medical contraindications in CHOICE Participants using combined hormonal
        contraception
        Over the Counter Oral Contraceptive Working Group

2015    Implementing immediate postpartum LARC
        Kansas University OB/GYN grand rounds

2015    The evidence for immediate Post-partum IUD insertion
        Kansas City Gynecologic Society

2105    Business of Medicine Medical Student Elective Course
        Legislating Medicine
        Washington University School of Medicine

2015    Getting Politics Out of the Exam Room: Combating Legislative Interference in
        the Patient-Provider Relationship
        National Abortion Federation Annual Meeting

2015    Are you meeting your patient's contraceptive needs?
        Tennessee Department of Health.

2015    Colorado Initiative to reduce unintended pregnancy (webinar): Reducing Unplanned
        Pregnancies in Colorado through Strategies to Promote Long-Acting Reversible
        Contraception
        Huffington Post, Live

2105    Method mix it up: Expanding options to meet the unique contraceptive needs of young
        people
        FIGO World Conference

2015    Getting to Yes-Interventions to Increase LARC Acceptance with a Focus on IUC
        Nurse Practitioners Women's Health Annual Symposium

2015    Put your megaphone where your mouth is: Getting your professional society to speak up
        Forum on Family Planning

2015    When Politics Trumps Science- Why is Birth control at Center Stage?
        Carbondale Illinois Grand Rounds

2016    Using research to effectively advocate
        Physicians for Reproductive Health Leadership Training Academy

2016    Partial Participation and Abortion Training in Residency: A Structure for Optimizing
        Learning and Clinical Care
        APGO/CREOG

| 2016 | Are we meeting the needs of our teen and adolescent patients? Our role in preventing unintended pregnancy. Barnes Jewish Hospital/Washington University School of Medicine CME Outreach. |
|------|---|
| 2016 | The emerging role of physicians as advocates<br>St Louis OB/GYN Society |
| 2016 | Legislation and Advocacy<br>Washington University School of Medicine- Elective course<br>Gun violence as a public health issue |
| 2016 | Legislative advocacy and the impact on public health<br>Washington University, Brown School of Social Work |
| 2017 | GOV 101<br>Learning to advocate at the MO legislature<br>Faculty |
| 2017 | Reevaluating the longevity of LARC<br>GrandRounds, BayState Medical Center |

Research Support:

3125-946435
Role: Principal Investigator
MERCK
*Ovarian function with prolonged use of the implant*
Award:January 2017-June2018
Award Amount: $279,126

U01DK106853 (Colditz, Sutcliffe)
Role: Co-investigator
NIH/NIDDK
*LUTS prevention in adolescent girls and women across the lifespan*
Award: 07/01/2015-06/31/2020

(Peipert, McNicholas)
Role: Co-Principal Investigator
Anonymous Donor
*EPIC: Evaluating prolonged use of the IUD/implant for Contraception*
Award: Sep8, 2014 – Aug 31, 2018
Award Amount: $ 1,000,000

National Institutes of Health- Loan Repayment Program
Role: Principal Investigator
*EPIC: Evaluating prolonged use of the IUD/implant for Contraception*
Aug 17, 2014- July 31, 2017
Award Amount: $70,000
Aug 1, 2016- July 31, 2018
Award Amount: $70,000

81615 (Peipert, McNicholas)
Role: Co-Principal Investigator

William and Flora Hewlett Foundation
*LIFE: Levonorgestrel Intrauterine system For Emergency Contraception; a multicenter randomized trial*
June1, 2014- May 31, 2015
Award Amount: $351,500

IRG-58-010-57 (McNicholas)
Role: Principal Investigator
American Cancer Society Institutional Research Grant (ACS-IRG)
*Evaluating the impact of the IUD on HPV and cervical cancer risk*
January 1, 2014-December 31, 2014
Award Amount: $30,000

SFPRF12-1 (McNicholas)
Role: Principal Investigator
Society of Family Planning Research Fund
*Effectiveness of Prolonged use of IUD/Implant for Contraception (EPIC)*
January 2012 – July 2014
Award Amount: $70,000

UL1 TR000448 (Evanoff)
Role:  Postdoctoral MSCI Scholar
NIH-National Center for Research Resources (NCRR)
Washington University Institute of Clinical and Translational Sciences (ICTS)
July 1, 2011 – June 30, 2013

5T32HD055172-03 (Macones, Peipert)
Role: Clinical fellow, trainee
NIH T32 Research Training Grant
July 1, 2011 – June 30, 2013

**Bibliography:**
Peer-reviewed Publications:
1.  Allsworth JE, Hladky KJ, Hotchkiss T, McNicholas C, Rohn A. Discussion: 'Douching and the risk for sexually transmitted disease' by Tsai et al. *Am J of Obstet and Gynecol* 2009;200(1):e11-4.

2.  Stoddard A, McNicholas C, Peipert JF.  Efficacy and safety of long-acting reversible contraception. *Drugs*. 2011 May 28;**71**(8): p. 969-80. PMID: 21668037

3.  McNicholas C, Hotchkiss T, Madden T, Zhao Q, Allsworth J, Peipert JF. Immediate postabortion intrauterine device insertion: continuation and satisfaction. *Women Health Iss.*  2012 Jul-Aug; 22(4):e365-369. PMID: 22749197

4.  McNicholas C, Peipert JF. Long-acting reversible contraception for adolescents. *Curr Opin Obstet Gyn.* 2012 Oct; 24(5):293-298. PMID: 22781078

5.  McNicholas C, Peipert JF. Initiation of long-acting reversible contraceptive methods (IUDs and implant) at pregnancy termination reduces repeat abortion. *Evid Based Med. 2013 Jun;18(3):e29.* PMID: 23161505

6.  McNicholas C, Madden T, Zhao Q, Secura G, Allsworth JE, Peipert JF. Cervical lidocaine for IUD insertional pain: a randomized controlled trial. *Am J Obstet Gynecol. 2012* Nov;207(5):384 e381-386. PMID: 23107081

7. <u>McNicholas C</u>, Zhao Q, Secura G, Allsworth J, Madden T, Peipert J. Contraceptive failures in overweight and obese combined hormonal contraceptive users. *Obstet Gynecol*. 2013 March; 121(3):585-92. PMID: 23635622

8. <u>McNicholas C</u>. Transcending politics to promote women's health. *Obstet Gynecol.* 2013 Jul;122(1):151-3. PMID: 23743460

9. Eisenberg D, <u>McNicholas C</u>, Peipert JF. Cost as a barrier to long-acting reversible contraceptive (LARC) use in adolescents. *J Adolescent Health*. 2013 Apr;52(4 Suppl):S59-63. PMID: 23535059

10. Grentzer J, <u>McNicholas C</u>, Peipert J. Use of the etonorgestrel-releasing implant. *Expert Rev. of Obstet and Gynecol*. 8 (4), 337-344. 2013

11. Secura G, <u>McNicholas C</u>. Long-acting reversible contraceptive use among teens prevents unintended pregnancy: a look at the evidence. *Expert Rev. of Obstet Gynecol*. 8(4), 297-299. 2013

12. <u>McNicholas C</u>, Peipert JF, Madipati R, Madden T, Allsworth, J Secura G. Sexually transmitted infection prevalence in a population seeking no-cost contraception. *Sex Transm Dis.* 2013 July;40(7):546-51. PMID: 23965768

13. Sehn JK, Kuroki LM, Hopeman MM, Longman RE, <u>McNicholas CP</u>, Huettner PC. Ovarian complete hydatidiform mole: case study with molecular analysis and review of the literature. *Hum Pathol*. 2013 Dec;44(12):2861-4. PMID: 24134929

14. Madden T, <u>McNicholas C</u>, Zhao Q, Secura G, Eisenberg D, Peipert JF. Association of Age and Partiy with IUD Expulsion. *Obstet Gynecol*. 2013 Oct; 124 (4): 718-26. PMID: 4172535

15. Secura G, Madden T, <u>McNicholas C</u>, Mullersman J, Buckel C, Zhao Q, Peipert JF. No-Cost Contraception Reduces Teen Pregnancy, Birth, and Abortion. *New Engl J Med.* 2104 Oct; 371(14); 1316-23. PMCID: 4230891

16. <u>McNicholas C</u>, Madden T, Secura G, Peipert JF. The Contraceptive CHOICE Project Round Up: What we did and what we learned. *Clin Obstet Gynecol.* 2014 Dec; 57(4); 635-43. PMCID: 4216614

17. <u>McNicholas C</u>, Maddipati R, Swor E, Zhao Q, Peipert JF. Use of the Etonogestrel Implant and Levonorgestrel Intrauterine Device Beyond the U.S. Food and Drug Administration-Approved Duration. *Obstet Gynecol,* 2015 Mar; 125(3):599-604.

18. Grentzer J, Peipert J, Zhao Q, <u>McNicholas C</u>, Secura G, Madden T. Risk-based screening for Chlamydia trachomatis and Neisseria gonorrhoeae prior to intrauterine device insertion. *Contraception* 2015 Jun; S0010-7824(15)00250-4. PMID:26093189

19. Mejia M, <u>McNicholas C</u>, Madden T, Peipert J. Association of Baseline Bleeding Pattern on Amenorrhea with Levonorgestrel Intrauterine System Use. *Contraception.* 2016 Nov;94(5):556-560. PMID: 27364099

20. Hou M, <u>McNicholas C</u>, Creinin M. Combined Oral Contraceptive Treatment for Bleeding Complaints with the Etonogestrel Contraceptive Implant: A Randomized Controlled Trial. Eur J Contracept Reprod Health Care. 2016 Oct;21(5):361-6. PMID: 27419258

21. Zigler RE, Peipert JF, Zhao Q, Maddipati R, <u>McNicholas C</u>. Long-acting reversible contraception use among residents in obstetrics/gynecology training programs. Open Access J of Contracept. 2017 Jan; 2017(8) 1—7.

22. Zigler RE, McNicholas C. Unscheduled vaginal bleeding with progestin-only contraceptive use. *Am J of Obstet and Gynecol*. 2017 May;216(5):443-450. PMID: 27988268.

23. McNicholas C, Swor E, Wan L, Peipert JF. Prolonged use of the etonogestrel implant and levonorgestrel intrauterine device: 2 years beyond Food and Drug Administration-approved duration. Am J Obstet Gynecol. 2017 Jan 29. PMID:28147241

24. McNicholas C, Peripert JF. Is it time to abandon the routine pelvic exam in asymptomatic nonpregnant women? JAMA 2017 Mar 7;317(9):910-911. PMID:28267835

25. Iseyemi A, Zhao Q, McNicholas C, Peipert JF. Socioeconomic Status As a Risk Factor for Unintended Pregnancy in the Contraceptive CHOICE Project. Obstet Gynecol. 2017 Sep;130(3):609-615. PMID: 28796678

26. McNicholas C, Klugman J, Zhao Q, Peipert J. Condom Use and Incident Sexually Transmitted Infection after Initiation of Long-Acting Reversible Contraception. *Am J of Obstet and Gynecol.* [In press]


Non-Peer Reviewed Invited Publications:

1. McNicholas C. Rev. of Recent advances in obstetrics and gynecology, *Royal Society of Medicine Press*, 2008.

2. McNicholas C, Levy B. The original minimally invasive hysterectomy; no hospitalization required. *Expert Rev. of Obstet and Gynecol*. 8(2), 1-3. 2013

**Chapters:**
1. Gross G, McNicholas C. Rev. of Shoulder dystocia and birth injury: prevention and treatment, by James A. O'Leary 3rd Ed
2. McNicholas C, Peipert JP. Pelvic inflammatory disease. *Practical Pediatric and Adolescent Gynecology*. Oxford. Wiley-Blackwell. ISBN: 978-0-470-67387-4.
3. McNicholas C, Madden T*., 2015 Contraceptive counseling for obese women*. In E. Jungheim (Ed) Obesity and Fertility. Springer, New York. ISBN 978-1-4939-2611-4

**Abstracts:**
1. McNicholas C, Maddipati R, Secura G, Peipert J. Use of the contraceptive implant beyond the FDA-approved duration. Poster Presentation. North American Forum on Family Planning. Miami, FL October 2014.

2. McNicholas C, Swor E, Peipert J, Secura G. Serum etonogestrel levels in women using the contraceptive implant beyond the FDA-approved duration*. Oral Presentation. North American Forum on Family Planning*. Seattle, WA October 2013.

3. McNicholas C, Zhao Q, Peipert J, Secura G. Condom use and incident sexually transmitted infection after initiation of long-acting reversible contraception. *Oral Presentation. 40th Annual Scientific Meeting of the Infectious Diseases Society for Obstetrics and Gynecology*. Sante Fe, NM Aug 2013.

4. McNicholas C, Madden T, Zhao Q, Secura G, Allsworth JE, Peipert JP. Cervical lidocaine for IUD insertional pain: a randomized controlled trial. *Poster Presentation*. *North American Forum on Family Planning*. Denver, CO. October 2012.

5. <u>McNicholas C</u>, Maddipati R, Allsworth J, Madden T, Peipert J, Secura G. Baseline sexually transmitted infection prevalence in a low risk urban population. *Oral Presentation. 39th Annual Scientific Meeting of the Infectious Diseases Society for Obstetrics and Gynecology.* Whistler, BC Aug 2012.

6. <u>McNicholas C</u>, Maddipati R, Allsworth J, Madden T, Peipert J, Secura G.   An epidemiologic comparison of *Chlamydia Trachomatis* and *Trichomonas Vaginalis*: Information from the Contraceptive CHOICE Project. *Poster Presentation, 39th Annual Scientific Meeting of the Infectious Diseases Society for Obstetrics and Gynecology.* Whistler, BC Aug 2012.

7. <u>McNicholas C</u>, Madden T, Zhao Q, Secura G, Allsworth J, Peipert J.  Cervical lidocaine for IUD insertional pain: a randomized control trial.  *Oral Presentation.   St. Louis Gynecologic Society*.  April 2012.

8. Madden T, <u>McNicholas CP</u>, Secura GM, Allsworth JE, Zhao Q, Peipert JF.  Rates of Expulsion and Continuation of Intrauterine Contraception at 12 months in Nulliparous and Adolescent Women. *Oral Presentation, Association of Reproductive Health Care Providers.*  Sept 2010.

9. <u>McNicholas CP</u>, Madden T, Secura GM, Allsworth JE, Zhao Q, Peipert JF.  Rates of Expulsion and Continuation of Intrauterine Contraception at 12 months in Nulliparous and Adolescent Women. *Oral Presentation, Rothman Resident Research Day.*  April 2010.

10. <u>McNicholas C</u>.  Acute Myelogenous Leukemia (AML) in an HIV Patient. A Diagnosis of exclusion and the implications of Cytogenetics.  *Publication and Poster presentation Seaton Hall Research Colloquium.*   May 2006.