# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | |
|---|---|
| COMPREHENSIVE HEALTH OF PLANNED PARENTHOOD GREAT PLAINS, et al., | |
| Plaintiffs, | |
| v. | Case No. |
| RANDALL W. WILLIAMS, MD, in his official capacity as Director of the Missouri Department of Health and Senior Services, et al., | |
| Defendants. | |

**DECLARATION OF KRISTIN METCALF-WILSON, NP, IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**

Kristin Metcalf-Wilson, NP, declares the following:

1.      I am the Assistant Vice President of Health Services for Comprehensive Health of Planned Parenthood Great Plains ("Comprehensive Health") and therefore am familiar with its health operations. Comprehensive Health operates two licensed abortion facilities in Missouri: one in Kansas City and one in Columbia. I submit this declaration in support of Plaintiff's Motion for Temporary Restraining Order.

**REPEATED ATTEMPTS TO OBTAIN APPROVAL OF COMPLICATION PLAN**

2.      Because medication abortions could not be provided starting on October 24 without a DHSS-approved complication plan, I understand the other Planned Parenthood affiliate in Missouri, Plaintiff Reproductive Health Services of Planned Parenthood of the St. Louis Region ("RHS"), first began reaching out to DHSS about compliance with S.B. 5's many restrictions, including the complication plan requirement, on September 7, so that there would be no interruption in medication abortion services, and even included a proposed complication plan

at that time. After not having heard back in nearly two weeks, RHS again contacted DHSS on September 20, requesting a time to discuss the proposed plan, but heard nothing back.

3.     On October 2, 2017, a few weeks before S.B. 5 was scheduled to take effect, DHSS published a memorandum to Missouri physicians, abortion facilities, and hospitals "outlining [its] plan for implementing laws in Senate Bill 5." Memorandum from Mo. Dep't of Health & Senior Servs., to Mo. Physicians, Abortion Facilities, and Hospitals, Regarding Abortion Laws Effective October 24, 2017 (Oct. 2, 2017), http://health.mo.gov/safety/abortion/pdf/sb5-memo.pdf. In this memorandum, DHSS stated that medication abortion providers would have to have a written contract with a board-certified or board-eligible obstetrician-gynecologist ("ob-gyn") or ob-gyn group who has agreed to be "on call and available twenty-four hours a day, seven days a week" to "personally treat all complications" from medication abortion "except in any case where doing so would not be in accordance with the standard of care or the patient's best interest for a different physician to treat her." The memorandum also stated that the contracted physician would be required to "[a]ssess each patient individually and shall not, as a matter of course, refer all patients to the emergency room or other facilities or physicians unless the patient is experiencing an immediately life-threatening complication." The memorandum did not mention any requirement that the contracted ob-gyn physician be located within a certain distance of the relevant health center or that the ob-gyn have admitting privileges at a nearby hospital.

4.     Not long after obtaining an abortion facility license for its Columbia health center, on October 16, Comprehensive Health submitted a complication plan consistent with the October 2 memorandum's requirements for both its Kansas City and Columbia facilities for DHSS's approval. Comprehensive Health's proposed complication plan stated that all physicians

performing abortions at its two licensed abortion facilities in Missouri (Columbia and Kansas City) are board-certified ob-gyns, and that, in addition to these physicians, Comprehensive Health's Medical Director, who is also a board-certified ob-gyn, is available to ensure 24/7 coverage when a treating physician is unavailable. In addition, the plan explains that all Planned Parenthood abortion patients receive detailed instructions about what to expect during the medication abortion, including what level of bleeding or other symptoms constitute cause for concern. Patients are also given information about a telephone hotline that is available twenty-four hours a day, seven days per week to call in case patients have any questions or concerns. A trained on-call nurse will assess each patient who calls the hotline and identify and manage any problems the patient may be experiencing. An on-call physician is available to the nurse 24/7 to respond to questions and determine a plan of care, if necessary. If further evaluation is needed, the patient will be directed to come to a Planned Parenthood health center during business hours, and, in an effort to comply with the October 2 memorandum, the plan stated that if follow-up care from a physician is required, a physician will be available to personally treat the patient. Under the plan, if a patient cannot be evaluated and managed at a health center in a timely manner, when in the patient's best interest or in accordance with the standard of care, the patient will be referred to an emergency department with certain instructions. I attach a true and correct copy of the October 16 complication plan as Exhibit 1. DHSS rejected this proposed complication plan.

5.     On October 23, Comprehensive Health submitted a revised plan. The revised complication plan clarified what I understand to be a medically unnecessary requirement of DHSS (and which was always unnecessary to the care of our patients): that the on-call physician, who is available to the on-call nurse 24/7, is an ob-gyn and that an ob-gyn would personally treat

any patient returning to the health center during office hours. I attach a true and correct copy of the October 23 complication plan as Exhibit 2. DHSS rejected the October 23 plan as well.

6.     On October 24, DHSS promulgated emergency administrative rules largely the same as their October 2 memorandum establishing its requirements for the complication plans required by S.B. 5, as Mo. Code Regs. Ann. tit. 19 § 30-30.061 (the "Complication Plan Regulation" or the "Regulation"). Later that same day, Comprehensive Health submitted another revision to its proposed complication plan, clarifying that again, although not medically necessary, an ob-gyn will be available 24/7 to personally treat complications related to medication abortion. I attach a true and correct copy of the October 24 complication plan as Exhibit 3.  DHSS again rejected the plan.

7.     By October 26, DHSS made clear for the first time that it was requiring separate plans for each health center and that the complication plan must include a contract with a local physician who has hospital privileges near the abortion facility, which as I explain below, has not been possible for the Columbia health center. Therefore, on October 26, Comprehensive Health submitted another revised complication plan solely for its Kansas City health center. The revisions made clear that Comprehensive Health's Medical Director, who is an ob-gyn and who has admitting privileges at a full-service, acute care hospital located within 30 miles of the Kansas City health center, is available 24/7 to personally treat complications related to medication abortions provided at the Kansas City health center. I attach a true and correct copy of the October 26 complication plan as Exhibit 4. DHSS rejected that plan too.

8.     On October 27, Comprehensive Health again submitted revisions to its Kansas City complication plan clarifying that *both* the Kansas City ob-gyn provider and the backup ob-gyn provider (Comprehensive Health's Medical Director) maintain admitting privileges at a full-

4

service, acute care hospital located within 30 miles of the Kansas City health center and that the Kansas City ob-gyn provider would be available to treat complications 24/7 when the Medical Director was unavailable. At that point, DHSS approved the plan. DHSS transmitted its approval minutes before the close of business on Friday, barely preventing last-minute cancellations for Monday patients. I attach a true and correct copy of the October 27 Kansas City complication plan as Exhibit 5.

9.     Once it became clear that DHSS was requiring a local privileged physician (which it knew from prior litigation that Comprehensive Health was unable to identify), *and* one that would treat any complication 24/7, on October 26, we reminded DHSS that in addition to our protocols, which more than satisfy the standard of care, the Columbia health center also has a written transfer agreement with a local hospital. The agreement is designed "to facilitate continuity of care and the timely transfer of patients and records." The agreement also provides for patients to be admitted to the hospital if necessary. I attach a true and correct copy of the transfer agreement as Exhibit 6. DHSS deemed the hospital transfer agreement inadequate as well and again refused to approve a plan for the Columbia health center unless we could locate and enter into an agreement with a local ob-gyn with privileges at a hospital in Columbia. As a result, we have already been forced to cancel our patients' medication abortion procedures, and without relief from this Court, we will have to cancel medication abortions scheduled for Monday, November 6. The only way for our patients to obtain medication abortion in Missouri is if they travel to St. Louis or Kansas City.

## PREVIOUS ATTEMPTS TO FIND LOCAL PROVIDERS WILLING TO ASSOCIATE WITH THE COLUMBIA HEALTH CENTER

10.     Missouri law requires that all abortion providers have local hospital admitting privileges in order to provide abortions, but that law has been preliminarily enjoined. This was

always difficult in Columbia, and there were many periods of time when we could not provide abortions due to this requirement.

11.     For a short period in 2015, our Columbia physician (who has privileges in another part of the state) did have privileges at MU Health Care in Columbia. After the Missouri Senate's "Sanctity of Life" Committee focused on the relationship between our health center and MU Health Care, however, MU Health Care announced on September 24, 2015, that it would revoke our physician's privileges. MU Health Care's decision related in no way to the quality of care that Comprehensive Health's physician provides.

12.     In order to continue to provide abortions, Comprehensive Health, including myself personally, worked diligently to convince MU Health Care to reconsider and also to locate a new physician with privileges to provide abortion care at the Columbia health center. I reached out to physician contacts within the community and had located two physicians with current hospital privileges who seriously considered providing services at the Columbia health center. However, because of the hostile political environment in Missouri toward abortion, those physicians were unwilling to subject themselves and their families to the scrutiny and the potential harassment that come with providing abortion.

13.     I also attempted to secure backup physicians with local hospital privileges who would be willing to enter into an agreement with Comprehensive Health. The proposed agreement would have stated that the backup physician agreed to admit patients to the hospital on behalf of Comprehensive Health's physician. I identified a handful of providers who might be willing, but only three were ob-gyns. However, none of the ob-gyns (or other physicians) would agree to enter into a contract with Comprehensive Health because of fear of harassment or professional consequences.

Case 2:17-cv-04207-BP   Document 4-2   Filed 10/30/17   Page 7 of 36

14. Nearly all ob-gyns in Columbia practice in one of the two hospital ob-gyn practice groups. One group refused to take my calls, and the other declined to contract with us.

15. I continued searching for a new physician, including going through the entire medical network in Columbia and the wider Mid-Missouri region to identify a provider or providers who either already had local hospital privileges or who were willing to apply for privileges, to no avail.

16. Our inability to find a backup ob-gyn in Columbia is not surprising given Planned Parenthood Great Plains' extensive efforts to find a physician in Arkansas willing to contract with us to provide backup care. Similar to the Complication Plan Regulation in Missouri, an Arkansas law mandates that physicians who provide medication abortion have a signed contract with a physician with admitting and surgical privileges at an Arkansas hospital who has agreed to handle complications. But unlike the Complication Plan Regulation, the Arkansas law does not require the contracted physician have such privileges at a hospital near the health center. *See* Ark. Code Ann. § 20-16-1504(d). Thus, in order to comply with the Arkansas law, we did not limit our search to local physicians and we targeted every ob-gyn in Arkansas. Over a period of about 18 months, we have twice sent a letter to every ob-gyn in the state explaining the law's requirement and asking them to contact us if they would be willing to contract with us. We also separately called many ob-gyns to explain the requirement and the impact on abortion access if we could not comply with the law. Although we reached out to at least sixty physicians in total, in addition to the letters, we have been unable to identify a single ob-gyn that would enter into a written contract with us. As with my experience searching for providers in Columbia, some Arkansas physicians or group practices informed us that they do not support a woman's right to access abortion and would not help us. Others stated that they simply could not work with us.

7

17.     Comprehensive Health has not been able to find a local ob-gyn with privileges at a hospital near the Columbia health center who is willing to contract with us. Given that neither DHSS's October 2 memorandum nor its October 24 Complication Plan Regulation requires that the contracted ob-gyn be local to the relevant health center or that she or he have local admitting privileges, we had no reason to commence another exhaustive search for a local ob-gyn contract physician. Even if we had more than four days to find such a physician before we had to cancel the medication abortions we already had on the schedule, it would have been exceedingly unlikely that we would have been be able to find such a physician for the reasons described above.

I declare under penalty of perjury the foregoing is true and correct.

Dated: October 30, 2017

s/ Kristin Metcalf-Wilson
Kristin Metcalf-Wilson, NP

8

# EXHIBIT 1

**Department of Health and Senior Services Complication Plan**

| DIVISION: | Health Services | EFFECTIVE DATE: | October 24, 2017 |
|---|---|---|---|
| WORK PRACTICE: | DHSS Medical Abortion Complication Plan | NUMBER OF PAGES: | 2 |
| DOCUMENT RELATED TO: | Senate Bill 5 | | |

### I.    Purpose

This plan is submitted in order to comply with Senate Bill 5 (HCS for SS for SB5, 99th General Assembly, Second Extraordinary Session (2017)). Pursuant to SB5, facilities licensed to perform abortions must have in place a complication plan that meets certain standards.

### II.    Facility Physicians

This plan applies to PPGP's two licensed abortion facilities in Missouri: one in Columbia and one in Kansas City (the Patty Brous facility). Physicians performing medication abortions in both facilities are board-certified by the American Board of Obstetrics and Gynecology or the American Osteopathic Board of Obstetrics and Gynecology ("OB/GYN").  In addition to these physicians, PPGP's Medical Director is a board-certified OB/GYN and is available to ensure there is 24/7 coverage when the treating physicians are unavailable.

### III.    Treatment of Complications

PPGP maintains an answering service for which a nurse (RN, LPN, or NP) is on call 24 hours a day, 7 days a week to address patients' questions and concerns. Patients who have a medication abortion must receive written post-abortion care instructions that:

- provide signs and symptoms of problems to watch for;
- instruct patients on what to do if a problem occurs, including when to contact the on-call nurse; and
- provide the phone number of the answering service to reach the on-call nurse.

When a patient calls the 24/7 answering service, the call will be forwarded to the nurse on-call.  The on-call nurse must be trained to assess each patient individually and identify and manage problems the patient may be experiencing, in accordance with established protocols.  A physician is available to the on-call nurses 24/7 to respond to questions and determine plan of care, if necessary.

1

**Department of Health and Senior Services Complication Plan**

If the on-call nurse or the on-call physician determines follow-up care is needed, the patient will be directed to return to a health center to receive such care. If a patient requires follow-up care from a physician during office hours, a physician will be available to personally treat complications relating to medication abortions.

If the complication cannot be evaluated and managed at a PPGP health center in a timely manner, and when in the best interest of the patient or in accordance with the standard of care, the on-call nurse or physician will refer a patient to the emergency room for treatment relating to complications. The patient must be instructed to take with her to the emergency room the written take-home instructions that were previously provided to her, which explain that the patient received abortion care, and encourages the emergency room to contact the 24/7 answering service. The patient must also be instructed to call the on-call nurse once she arrives at the emergency room.

The on-call nurse must not, as a matter of course, call the emergency room in advance without the patient's consent in order to protect her confidentiality and privacy, as the patient may decide to go to a different hospital for a variety of reasons (such as financial issues, insurance coverage, or concerns about confidentiality).

Once the patient arrives at the emergency room, she or, with the permission of the patient, the attending physician or other clinician managing her care should call the PPGP on-call nurse so that the attending physician or other clinician managing the patient's care can be briefed on the care the patient received.

On-call nurses document each call, including those that do not involve complications, and enter notes into patient records.  The on-call nurses maintain communication with each other regarding patients who were assessed and require follow-up care.

IV.     **Follow-up Care**

In the event the on-call nurse advises a patient to seek emergency care, a follow-up call is made to that patient within 24 hours. The follow-up call is to be documented in NextGen.

# EXHIBIT 2

**Department of Health and Senior Services Complication Plan**

| DIVISION: | Health Services | EFFECTIVE DATE: | October 24, 2017 |
|---|---|---|---|
| WORK PRACTICE: | DHSS Medical Abortion Complication Plan | NUMBER OF PAGES: | 2 |
| DOCUMENT RELATED TO: | Senate Bill 5 | | |

### I.       Purpose

This plan is submitted in order to comply with Senate Bill 5 (HCS for SS for SB5, 99th General Assembly, Second Extraordinary Session (2017)). Pursuant to SB5, facilities licensed to perform abortions must have in place a complication plan that meets certain standards.

### II.       Facility Physicians

This plan applies to PPGP's two licensed abortion facilities in Missouri: one in Columbia and one in Kansas City (the Patty Brous facility). Physicians performing medication abortions in both facilities are board-certified by the American Board of Obstetrics and Gynecology or the American Osteopathic Board of Obstetrics and Gynecology ("OB/GYN").  In addition to these physicians, PPGP's Medical Director is a board-certified OB/GYN and is available to ensure there is 24/7 coverage when the treating physicians are unavailable.

### III.       Treatment of Complications

PPGP maintains an answering service for which a nurse (RN, LPN, or NP) is on call 24 hours a day, 7 days a week to address patients' questions  and concerns. A board-certified OB/GYN physician is available to the on-call nurse 24/7 to respond to questions and determine plan of care, if necessary.

Patients who have a medication abortion must receive written post-abortion care instructions that:

- provide signs and symptoms of problems to watch for;

- instruct patients on what to do if a problem occurs, including when to contact the on-call nurse; and

- provide the phone number of the answering service to reach the on-call nurse.

When a patient calls the 24/7 answering service, the call will be forwarded to the on-call nurse.  The on-call nurse must be trained to assess each patient individually and identify and manage problems the patient may be experiencing, in accordance with established protocols.

**Department of Health and Senior Services Complication Plan**

After the patient is personally assessed, and if the on-call nurse and/or the on-call OB/GYN physician determines that follow-up care is needed, the patient will be directed to return to a health center to receive such care. If a patient requires follow-up care from a physician during office hours, an OB/GYN physician will be available to personally treat complications relating to medication abortions.

After the patient is personally assessed, and if the on-call nurse and/or the on-call OB/GYN physician determines that it is not in the patient's best interest or it would not be in accordance with the standard of care for the patient to return to a health center during office hours, the patient will be instructed to go to her nearest emergency room. The patient must be instructed to take with her to the emergency room the written take-home instructions that were previously provided to her, which explain that the patient received abortion care, and encourages the emergency room to contact the 24/7 answering service. The patient must also be instructed to call the on-call nurse once she arrives at the emergency room.

The on-call nurse must not, as a matter of course, call the emergency room in advance without the patient's consent in order to protect her confidentiality and privacy, as the patient may decide to go to a different hospital for a variety of reasons (such as financial issues, insurance coverage, or concerns about confidentiality).

Once the patient arrives at the emergency room, she or, with the permission of the patient, the attending physician or other clinician managing her care should call the PPGP on-call nurse so that the attending physician or other clinician managing the patient's care can be briefed on the care the patient received.

On-call nurses document each call, including those that do not involve complications, and enter notes into patient records. The on-call nurses maintain communication with each other regarding patients who were assessed and require follow-up care.

IV.     **Follow-up Care**

In the event the on-call nurse advises a patient to seek emergency care, a follow-up call is made to that patient within 24 hours. The follow-up call is to be documented in NextGen.

# EXHIBIT 3

PLANNED PARENTHOOD GREAT PLAINS

**Department of Health and Senior Services Complication Plan**

| DIVISION: | Health Services | EFFECTIVE DATE: | October 24, 2017 |
|---|---|---|---|
| WORK PRACTICE: | DHSS Medical Abortion Complication Plan | NUMBER OF PAGES: | 2 |
| DOCUMENT RELATED TO: | Senate Bill 5 | | |

### I.      Purpose

This plan is submitted in order to comply with Senate Bill 5 (HCS for SS for SB5, 99th General Assembly, Second Extraordinary Session (2017)). Pursuant to SB5, facilities licensed to perform abortions must have in place a complication plan that meets certain standards.

### II.      Facility Physicians

This plan applies to PPGP's two licensed abortion facilities in Missouri: one in Columbia and one in Kansas City (the Patty Brous facility). Physicians performing medication abortions in both facilities are board-certified by the American Board of Obstetrics and Gynecology or the American Osteopathic Board of Obstetrics and Gynecology ("OB/GYN").  In addition to these physicians, PPGP's Medical Director is a board-certified OB/GYN and is available to ensure there is backup coverage 24 hours a day, 7 days a week ("24/7") when the treating physicians are unavailable.

### III.      Treatment of Complications

PPGP maintains an answering service for which a nurse (RN, LPN, or NP) is on call 24/7 to address patients' questions  and concerns. A board-certified OB/GYN physician is available to the on-call nurse 24/7 to respond to questions and determine plan of care, if necessary.

Patients who have a medication abortion must receive written post-abortion care instructions that:

- provide signs and symptoms of problems to watch for;

- instruct patients on what to do if a problem occurs, including when to contact the on-call nurse; and

- provide the phone number of the answering service to reach the on-call nurse.

When a patient calls the 24/7 answering service, the call will be forwarded to the on-call nurse.  The on-call nurse must be trained to assess each patient individually and identify and manage problems the patient may be experiencing, in accordance with established protocols.

1

**PLANNED PARENTHOOD GREAT PLAINS**

**Department of Health and Senior Services Complication Plan**

After the patient is personally assessed, and if the on-call nurse and/or the on-call OB/GYN physician determines that follow-up care is needed, the patient will be directed to return to a health center to receive such care. If a patient requires follow-up care from a physician, an OB/GYN physician will be available 24/7 to personally treat complications relating to medication abortions.

However, if after the patient is personally assessed and if the on-call nurse and/or the on-call OB/GYN physician determines that it is not in the patient's best interest or it would not be in accordance with the standard of care for the patient to receive follow-up treatment from the on-call OB/GYN physician, the patient will be instructed to go to her nearest emergency room. The patient must be instructed to take with her to the emergency room the written take-home instructions that were previously provided to her, which explain that the patient received abortion care, and encourages the emergency room to contact the 24/7 answering service. The patient must also be instructed to call the on-call nurse once she arrives at the emergency room.

The on-call nurse must not, as a matter of course, call the emergency room in advance without the patient's consent in order to protect her confidentiality and privacy, as the patient may decide to go to a different hospital for a variety of reasons (such as financial issues, insurance coverage, or concerns about confidentiality).

Once the patient arrives at the emergency room, she or, with the permission of the patient, the attending physician or other clinician managing her care should call the PPGP on-call nurse so that the attending physician or other clinician managing the patient's care can be briefed on the care the patient received.

On-call nurses document each call, including those that do not involve complications, and enter notes into patient records. The on-call nurses maintain communication with each other regarding patients who were assessed and require follow-up care.

IV.    **Follow-up Care**

In the event the on-call nurse advises a patient to seek emergency care, a follow-up call is made to that patient within 24 hours. The follow-up call is to be documented in NextGen.

2

# EXHIBIT 4

**Department of Health and Senior Services Complication Plan**

| DIVISION: | Health Services | EFFECTIVE DATE: | October 26, 2017 |
|---|---|---|---|
| WORK PRACTICE: | DHSS Medical Abortion Complication Plan | NUMBER OF PAGES: | 2 |
| DOCUMENT RELATED TO: | Senate Bill 5 | | |

I. **Purpose**

This plan is submitted in order to comply with Senate Bill 5 (HCS for SS for SB5, 99th General Assembly, Second Extraordinary Session (2017)). Pursuant to SB5, facilities licensed to perform abortions must have in place a complication plan that meets certain standards.

I. **Facility Physicians**

This plan applies to PPGP's licensed abortion facility in Kansas City (the Patty Brous facility). The physician performing medication abortions in Kansas City is board-certified by the American Board of Obstetrics and Gynecology. In addition to this physician, PPGP's Medical Director is a board certified OB/GYN who has admitting privileges at a full-service, acute care hospital located within 30 miles of the Patty Brous health center and is available 24/7 to personally treat complications relating to medication abortions, including by providing surgical follow-up care. Treatment of Complications

PPGP maintains an answering service for which a nurse (RN, LPN, or NP) is on call 24/7 to address patients' questions and concerns. A board-certified OB/GYN physician is available to the on-call nurse 24/7 to respond to questions and determine plan of care, if necessary.

Patients who have a medication abortion must receive written post-abortion care instructions that:

- provide signs and symptoms of problems to watch for;

- instruct patients on what to do if a problem occurs, including when to contact the on-call nurse; and

- provide the phone number of the answering service to reach the on-call nurse.

When a patient calls the 24/7 answering service, the call will be forwarded to the on-call nurse. The on-call nurse must be trained to assess each patient individually and identify and manage problems the patient may be experiencing, in accordance with established protocols.

After the patient is personally assessed, and if the on-call nurse and/or the on-call OB/GYN physician determines that follow-up care is needed, the patient will be directed to return to a health center to receive such care. If a patient requires follow-up care from a physician, an OB/GYN physician will be available 24/7 to personally treat complications relating to medication abortions, including providing surgical follow-up care, if necessary. This means that PPGP's Medical Director will personally treat complications 24/7 requiring physician care, including providing surgical

1

follow-up care, if necessary, relating to medication abortions provided to patients at the Patty Brous facility.

However, if after the patient is personally assessed and if the on-call nurse and/or the on-call OB/GYN physician determines that it is not in the patient's best interest or it would not be in accordance with the standard of care for the patient to receive follow-up treatment from the on-call OB/GYN physician, the patient will be instructed to go to her nearest emergency room. The patient must be instructed to take with her to the emergency room the written take-home instructions that were previously provided to her, which explain that the patient received abortion care, and encourages the emergency room to contact the 24/7 answering service. The patient must also be instructed to call the on-call nurse once she arrives at the emergency room.

The on-call nurse must not, as a matter of course, call the emergency room in advance without the patient's consent in order to protect her confidentiality and privacy, as the patient may decide to go to a different hospital for a variety of reasons (such as financial issues, insurance coverage, or concerns about confidentiality).

Once the patient arrives at the emergency room, she or, with the permission of the patient, the attending physician or other clinician managing her care should call the PPGP on-call nurse so that the attending physician or other clinician managing the patient's care can be briefed on the care the patient received.

On-call nurses document each call, including those that do not involve complications, and enter notes into patient records. The on-call nurses maintain communication with each other regarding patients who were assessed and require follow-up care.

## II.     Follow-up Care

In the event the on-call nurse advises a patient to seek emergency care, a follow-up call is made to that patient within 24 hours. The follow-up call is to be documented in NextGen.

## III.    Reporting

The OB/GYN treating a patient's complication shall prepare a complication report as required by § 188.052, RSMo, and ensure that the report is submitted to the Missouri Department of Health and Senior Services and placed in the patient's medical record.

## IV.     Covered Physicians

The PPGP physician covered by this plan is Dr. Ronald Yeomans, M.D. The OB/GYN providing 24/7 back-up complication coverage is Dr. Orrin Moore, M.D. A copy of the written agreement between PPGP and Dr. Moore is attached to this plan, along with a copy of Dr. Moore's OB/GYN board certification credentials profile.

2

# EXHIBIT 5

**Department of Health and Senior Services Complication Plan**

| DIVISION: | Health Services | EFFECTIVE DATE: | October 27, 2017 |
|---|---|---|---|
| WORK PRACTICE: | DHSS Medical Abortion Complication Plan | NUMBER OF PAGES: | 2 |
| DOCUMENT RELATED TO: | Senate Bill 5 | | |

I. **Purpose**

This plan is submitted in order to comply with Senate Bill 5 (HCS for SS for SB5, 99th General Assembly, Second Extraordinary Session (2017)). Pursuant to SB5, facilities licensed to perform abortions must have in place a complication plan that meets certain standards.

II. **Facility Physicians**

This plan applies to PPGP's licensed abortion facility in Kansas City (the Patty Brous facility). The physician performing medication abortions in Kansas City (Dr. Ronald Yeomans, M.D.) is board-certified by the American Board of Obstetrics and Gynecology. In addition to this physician, PPGP's Medical Director (Dr. Orrin Moore, M.D.) is a board-certified OB/GYN. Both of these OB/GYNs have admitting privileges at a full-service, acute care hospital located within 30 miles of the Patty Brous health center. As the Medical Director, Dr. Moore shall personally treat complications 24/7 relating to medication abortions, including by providing surgical follow-up care.  If Dr. Moore is ever unavailable to treat complications, Dr. Yeomans will treat complications 24/7 during the time that Dr. Moore is unavailable.

III. **Treatment of Complications**

PPGP maintains an answering service for which a nurse (RN, LPN, or NP) is on call 24/7 to address patients' questions  and concerns. A board-certified OB/GYN physician is available to the on-call nurse 24/7 to respond to questions and determine plan of care, if necessary.

Patients who have a medication abortion must receive written post-abortion care instructions that:

- provide signs and symptoms of problems to watch for;

- instruct patients on what to do if a problem occurs, including when to contact the on-call nurse; and

- provide the phone number of the answering service to reach the on-call nurse.

When a patient calls the 24/7 answering service, the call will be forwarded to the on-call nurse. The on-call nurse must be trained to assess each patient individually and identify and manage problems the patient may be experiencing, in accordance with established protocols.

After the patient is personally assessed, and if the on-call nurse and/or the on-call OB/GYN physician determines that follow-up care is needed, the patient will be directed to return to a health center to receive such care. If a patient requires follow-up care from a physician, Dr. Moore will

personally treat complications relating to medication abortions, including those requiring surgical follow-up care, which were provided to patients at the Patty Brous facility.

However, if after the patient is personally assessed and if the on-call nurse and/or Dr. Moore determines that it is not in the patient's best interest or it would not be in accordance with the standard of care for the patient to receive follow-up treatment from Dr. Moore, the patient will be instructed to go to her nearest emergency room. The patient must be instructed to take with her to the emergency room the written take-home instructions that were previously provided to her, which explain that the patient received abortion care, and encourages the emergency room to contact the 24/7 answering service. The patient must also be instructed to call the on-call nurse once she arrives at the emergency room.

The on-call nurse must not, as a matter of course, call the emergency room in advance without the patient's consent in order to protect her confidentiality and privacy, as the patient may decide to go to a different hospital for a variety of reasons (such as financial issues, insurance coverage, or concerns about confidentiality).

Once the patient arrives at the emergency room, she or, with the permission of the patient, the attending physician or other clinician managing her care should call the PPGP on-call nurse so that the attending physician or other clinician managing the patient's care can be briefed on the care the patient received.

On-call nurses document each call, including those that do not involve complications, and enter notes into patient records. The on-call nurses maintain communication with each other regarding patients who were assessed and require follow-up care.

### IV.  Follow-up Care

In the event the on-call nurse advises a patient to seek emergency care, a follow-up call is made by PPGP to that patient within 24 hours. The follow-up call is to be documented in NextGen.

### V.  Reporting

The OB/GYN treating a patient's complication shall prepare a complication report as required by § 188.052, RSMo, and ensure that the report is submitted to the Missouri Department of Health and Senior Services and placed in the patient's medical record.

### VI.  Covered Physicians

The PPGP physician covered by this plan is Dr. Ronald Yeomans, M.D. The OB/GYN providing 24/7 back-up complication coverage is Dr. Orrin Moore, M.D. A copy of the written agreement between PPGP and Dr. Moore is attached to this plan, along with a copy of Dr. Moore's and Dr.

2

**Department of Health and Senior Services Complication Plan**

Yeomans' OB/GYN board certification credentials profiles.

# EXHIBIT 6

# PATIENT TRANSFER AGREEMENT

THIS PATIENT TRANSFER AGREEMENT (the "Agreement") is made and entered into as of _____, 2016 (the "Effective Date"), by and between CH Allied Services, Inc. d/b/a Boone Hospital Center, ("Hospital"), and Comprehensive Health of Planned Parenthood Great Plains, located at 711 North Providence Road, Columbia, Missouri 65203 ("Facility").

## R E C I T A L S:

A.      Hospital is an acute care facility providing various specialized patient care services.

B.      Facility is an ambulatory surgical center.  Facility may be required to transfer certain patients to facilities such as Hospital that provide specialized patient care services.

C.      Whereas, the parties agree that it is in the best interest of patient care and would promote the optimum use of resources for each to arrange a process for the transfer of patients between Facility and Hospital as reflected in this Agreement.

**NOW, THEREFORE**, in order to facilitate continuity of care and the timely transfer of patients and records between the parties, all upon the terms and conditions contained herein, the parties agree as follows:

1.      **PURPOSE AND ACCEPTANCE OF PATIENTS.**  This Agreement is intended to facilitate the decision making process and transfer of patients between the Facility and Hospital.

2.      **TERM.**

A.      <u>Term</u>.  The initial term of this Agreement ("Initial Term") shall be for a period of one (1) year, commencing on the Effective Date, unless sooner terminated as provided herein.  At expiration of the Initial Term, this Agreement shall automatically renew for successive one (1) year periods (each "Renewal Term") until terminated as noted below.

B.      <u>Termination</u>.  Either party may terminate this Agreement: (1) without cause upon 30 days written notice to the other party; (2) upon breach by the other party of any material provision of this Agreement, provided such breach continues for fifteen (15) days after receipt by the breaching party of written notice of such breach from the non-breaching party; (3) immediately, upon the occurrence of any of the following events: (i) either party closes or discontinues its facility operation to such an extent that patient care cannot be carried out adequately; or (ii) either party loses its facility license, accreditation, or other authority to provide health care services, including the conviction of a criminal offense, or is excluded or otherwise ineligible to participate in a government program.

Case 2:17-cv-04207-BP   Document 4-2   Filed 10/30/17   Page 27 of 36

3. **TRANSFER OF PATIENTS.**

A.    <u>Generally</u>.  Hospital agrees to admit to its facility patients of Facility as promptly as possible when such admission is deemed medically appropriate by said patient's attending physician, provided that all conditions of eligibility for admission to Hospital are met.  To initiate the transfer, Facility, through a member of its nursing staff or the patient's attending physician, will contact the admitting office, Emergency Department or other designated department of the Hospital requested to accept the patient transfer to arrange for an appropriate transfer as contemplated herein; provided, however that the transfer protocols for stroke and STEMI shall be followed for stroke or STEMI patients, as set out in Exhibits A, B and C of this Agreement, incorporated herein by reference.  All transfers between Hospital and Facility shall be made in accordance with applicable federal and state laws and regulations, the standards of The Joint Commission, formerly the Joint Commission on the Accreditation of Healthcare Organizations ("TJC"), and any other applicable accrediting bodies, and reasonable policies and procedures of the Receiving Facility as communicated to the Transferring Facility.   The Hospital's responsibility for a patient's care shall begin when the patient is admitted to the Hospital.

B.    <u>Responsibilities of the Transferring Facility</u>.  The Transferring Facility shall:

1)    Provide, within its capabilities and capacity, for the medical screening and stabilizing treatment of the patient prior to transfer, including the use of appropriate personnel and equipment to assist with the coordination and transfer of the patient to the Receiving Facility.

2)    Notify the Receiving Facility's designated representative prior to transfer to obtain confirmation concerning the Receiving Facility's availability of services and staff to provide care to the transferring patient and inform the Receiving Facility concerning the estimated time of the patient's arrival at said Receiving Facility.

3)    Obtain the patient's or the patient's responsible party's consent to the transfer to the Receiving Facility and forward such consent with the patient, excepting all circumstances where the patient's condition precludes such consent.

4)    Forward to the Receiving Facility a copy of those portions of the patient's medical record that are available and relevant to the transfer and continued care of the patient, including records related to the patient's condition, observations of signs or symptoms, preliminary diagnosis, treatment provided, results of any tests, the patient's consent to the transfer or physician certification that the medical benefits of the transfer outweigh the risk of transfer, an authorization to treat signed by the individual authorized to consent to treatment for the transferring patient if said patient, in the opinion of the attending physician, is unable to consent to or authorize such medical treatment, and essential demographic and family information as available.  If all necessary and relevant medical records are

not available at the time the patient is transferred, then the Transferring Facility shall forward such records as soon as possible. Medical record information transmitted or transferred between either facility may be sent by hard copy, telefacsimile, telemetry or computer, or any combination thereof, in the reasonable discretion of the Transferring Facility.

5)      Transfer the patient's personal items, including, without limitation, money and valuables and information related to those items. Transferring Facility agrees to retain responsibility for these personal items until receipt is acknowledged, in writing, by Receiving Facility.

6)      Arrange for the transportation of a patient to be transferred to the Receiving Facility, including the selection of the mode of transportation and the appropriate personnel to accompany the patient.

7)      Comply as a Covered Entity with applicable state and federal privacy laws for maintaining the confidentiality of individually identifiable health information.

C.      Responsibilities of the Receiving Facility. The Receiving Facility shall:

1)      Comply with its admission policies regarding the care and treatment of patients.

2)      Designate a person who has authority to represent and coordinate the transfer and receipt of patients into the Hospital, and transmit the contact information for such person to the Transferring Facility.

3)      Communicate, as promptly as possible, information to the Transferring Facility of its availability of rooms or beds, services, and staff, and, if capable of acceptance, its acceptance of the transfer. Hospital shall accept transfers seven (7) days per week.

4)      Provide, within its capabilities, appropriate personnel, equipment, and services to treat the patient transferred.

5)      Comply, as a Covered Entity, with applicable state and federal privacy laws for maintaining the confidentiality of individually identifiable health information.

6)      Provide reasonable security and accountability for the transferred patient's personal items.

7)      Provide, as requested by the Transferring Facility, a copy of the Receiving Facility's medical records of the patient or other communication of information necessary or useful in the care and treatment of the patient transferred to address such patient's care program or plan either at the Transferring Facility, Receiving Facility or another facility to ensure the patient's continuity of care.

D.    Specific Patient Transfer Protocols for Stroke and STEMI.    For stroke patients, the parties agree to follow the Stroke Transfer Protocols for the Transferring Facility, Facility, and the Receiving Facility, Hospital, attached hereto as Exhibits A and B, and incorporated herein by reference.  For STEMI patients, the parties agree to follow the STEMI Transfer Protocol attached hereto as Exhibit C and incorporated herein by reference.  In addition, the parties may agree from time to time to additional protocols to cover other types of patients or to revisions to existing protocols.  If the parties mutually agree in writing to such protocols, such protocols or protocol revisions shall be incorporated into and made part of this Agreement.

4.    **COMPLIANCE WITH LAW.**  Both facilities shall comply with all applicable federal and state laws, rules and regulations, including, without limitation, those laws and regulations governing the maintenance of medical records and confidentiality of patient information as well as with all standards promulgated by any relevant accrediting agency.

5.    **INSURANCE AND INDEMNIFICATION.**

A.    Insurance.  Each party shall, during the term of this Agreement, maintain in force and effect, either through purchased insurance policy(ies) or a self-insurance program, the following coverages:

1)    Comprehensive general liability and professional liability insurance in the minimum amount of One Million Dollars ($1,000,000) per occurrence, Three Million Dollars ($3,000,000) annual aggregate;

2)    Workers' compensation in accordance with the requirements of law;

3)    Employers Liability Insurance in the minimum amount of One Million Dollars ($1,000,000) each incident, Five Hundred Thousand Dollars ($500,000) disease policy limit and One Hundred Thousand Dollars ($100,000) disease for each employee; and

4)    Professional Liability Insurance in the minimum amount of One Million Dollars ($1,000,000) per occurrence, Three Million Dollars ($3,000,000) annual aggregate, to cover its employees' acts and omissions in providing services hereunder.

If the preceding insurance is claims-made coverage, and if it is terminated or cancelled at any time, an extended reporting endorsement shall be purchased to insure continuous coverage at all times for claims arising out of the services provided during the term of this Agreement.

6.    **INDEMNIFICATION.**  Each party to this Agreement shall be responsible for its own acts and omissions in the performance of its duties hereunder, and the acts and omissions of its own employees and agents.  Each party shall indemnify the other against, and hold the other harmless from, any and all claims, actions, suits, proceedings, costs, expenses, damages, and liability, including attorneys' fees, resulting or arising from, or connected with, said party's

failure to comply with the terms of this Agreement, as well as liability arising solely from the negligence of said indemnifying party.

**7.     BILLING.** Each party to this Agreement shall be responsible for billing and collecting from the patient, third party prayer, or other responsible party for the items and services rendered to a patient by said party. Neither party shall have any liability to the other for any such charges.

**8.     REPRESENTATIONS.** Each party to this Agreement represents that: (A) it is not currently excluded, or threatened with exclusion, from participating in any federal or state-funded health care program, including Medicare, Medicaid, and TRICARE[1]; (B) it has never been subject to any sanctions by any of the aforementioned programs; and (C) the individuals executing this Agreement on behalf of the facilities or corporations represent and warrant that they have been authorized to do so. Each party shall notify the other of any imposed exclusions or sanctions, and the notified party reserves the right to terminate this Agreement upon receipt of such notice.

**9.     NONEXCLUSIVE AGREEMENT.** Nothing in this Agreement shall be construed as limiting the rights of either party to affiliate or contract with any other hospital, surgery center or skilled nursing facility on either a limited or general basis during the period of this Agreement.

**10.     INDEPENDENT CONTRACTORS.** Neither party is authorized or permitted to act as an agent or employee of the other party, and each party shall be responsible for only its own acts and omissions. Each party is independent from the other, and nothing in the Agreement will be construed or deemed to create a relationship of employer or employee, principal and agent or any relationship other than independent entities contracting with each other solely for the purpose of carrying out the terms and conditions of the Agreement.

**11.     NO PUBLICITY.** Neither party shall use the name of the other in any promotional or advertising material.

**12.     ENTIRE AGREEMENT; MODIFICATION.** This Agreement, including any exhibits, contains the entire understanding of the parties with respect to the subject matter hereof and

---

[1] The parties to this Agreement acknowledge that Hospital has been informed by Facility that the State of Kansas has attempted to terminate Planned Parenthood Great Plains ("PPGP") (formerly known as Planned Parenthood of Kansas and Mid-Missouri ("PPKM")) from participation in the Kansas Medicaid program. The stated bases for the termination do not relate to any claims of fraud or malfeasance by PPGP/PPKM. PPGP and Medicaid beneficiary plaintiffs brought litigation to prevent the termination, and the termination currently is enjoined by court order; the state has appealed. Facility has also informed Hospital that PPGP has announced plans for an upcoming consolidation pursuant to which it will operate facilities in Arkansas and Oklahoma that are currently operated by another Planned Parenthood affiliate. The Arkansas health centers have also been subject to an attempted termination by the State of Arkansas for reasons that do not relate to any claims of fraud or malfeasance by PPGP/PPKM. The Arkansas health centers have also brought litigation to prevent the termination, and the termination currently is enjoined by court order; the state has appealed. Facility agrees to immediately inform Hospital should it, or Planned Parenthood Great Plains, be terminated from any state Medicaid program for any reason, including as a result of these litigations.

supersedes all prior agreements, oral or written, and all other communications between the parties relating to such subject matter. This Agreement may not be amended or modified except by mutual written agreement. This Agreement shall be binding upon the successors or assigns of the parties hereto.

**13. GOVERNING LAW.** This Agreement shall be construed in accordance with the laws of the State of Missouri and venue for any action filed pertaining to this Agreement shall be Boone County, Missouri. The provisions set forth herein shall survive expiration or other termination of this Agreement regardless of the cause of such termination.

**14. PARTIAL INVALIDITY.** If any provision of this Agreement is prohibited by law or court decree of any jurisdiction, said prohibition shall not invalidate or affect the remaining provisions of this Agreement.

**15. NOTICES.** All notices hereunder by either party to the other shall be in writing, delivered personally, by certified or registered mail, return receipt requested, or by overnight courier, and shall be deemed to have been duly given when delivered personally or when deposited in the United States mail, postage prepaid, addressed as follows:

| | |
|---|---|
| If to Hospital: | CH Allied Services, Inc. d/b/a Boone Hospital Center<br>Attn: James Sinek, President<br>1600 East Broadway<br>Columbia, MO 65201 |
| With Copy To: | Boone Hospital Center<br>Attn: Kate Pitzer, Legal Counsel<br>1600 East Broadway<br>Columbia, MO 65201 |
| If to Facility: | Comprehensive Health of Planned Parenthood Great Plains<br>Attn: Kristin Metcalf-Wilson, Assistant Vice President<br>of Health Services<br>711 North Providence Road<br>Columbia, Missouri 65203 |

or to such other persons or places as either party may from time to time designate by written notice to the other. Notice shall be deemed given upon personal delivery or forty-eight (48) hours after being sent by certified mail, return receipt requested.

**16. WAIVER.** A waiver by either party of a breach or failure to perform hereunder shall not constitute a waiver of any subsequent breach or failure.

**17. BINDING EFFECT.** This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, representatives, successors and permitted assigns. Neither this Agreement nor any rights hereunder may be assigned without the consent in writing of the non-assigning party, which consent shall not be unreasonably withheld, except that either party may assign its interest or delegate the performance of its obligations to a subsidiary or affiliate of that party without the consent of the other party.

**HOSPITAL:**                                                **FACILITY:**

CH Allied Services, Inc.
d/b/a Boone Hospital Center



By:                                            By:

                                                 Name:
                                                 Title: _President & CEO_

## EXHIBIT A

**Stroke Patient Transfer Protocol to Boone Hospital Center**

Stroke patient presents at FACILITY

⬇

FACILITY Physician will call 1.877.60.BOONE (1.877.602.6663)

FACILITY Physician will identify call as a "Code STROKE"

⬇

HOSPITAL telecom operator will page the House Supervisor.
FACILITY Physician will remain on the line.

⬇

HOSPITAL House Supervisor will greet FACILITY Physician and
- Confirm "Is your patient being referred for Stroke?"
- Obtain information from the referring physician
- Initiate a three-party conference call by contacting the On-call Neurologist's or Neurosurgeon's cell phone.

⬇

FACILITY Physician will confer directly with receiving HOSPITAL Neurologist/Neurosurgeon
- Ischemic stroke or hemorrhage stroke
- Inclusion/exclusion criteria for lytic treatment or neuro-intervention eligibility
  - tPA initiation at FACILITY to be ordered by receiving facility physician
  - imaging beyond non-contrast head CT to be ordered by receiving facility physician
- Need for rapid transfer

⬇

FACILITY will have prior arranged agreements with ground and air transfer agencies. Expedited transport will be encouraged with consideration for restrictions of inclement weather.

⬇

Transfer/Airlift patient to
HOSPITAL ICU

## EXHIBIT B

## Acute Stroke Protocol for Boone Hospital Center



Referring facility calls Boone Hospital Center Patient Referral Line (1-877-60-BOONE)
Conferences with sending physician, neurologist, and BHC House Supervisor (one-call transfer protocol)

Obtain:
1. Time of last known well/normal (LKW), confirm ≤ 6 hours (≥8 hours subject to expert consultation: Anterior Circulation Occlusion 12 H or <, / Posterior Circulation Occlusion < 24 H )
2. FAST (Face, Arms, Speech, Time) screen /if available NIHSS total
3. ABC's-oxygen if needed, VS, weight, cardiac monitor and pulse ox applied, IV placed.
   Order: stroke protocol lab work*, EKG, emergent non-contrast CT scan of brain, PCXR

*Stroke Protocol Lab Work:
CBC, CMP, PT/INR, PTT, Fibrinogen, Troponin I, Type and Screen, FSBG, HcG in women < 50

IV tPA available at referring facility?

YES — tPA given to patient at referring facility and EMS transports to BHC.

EMS rendezvous with House Supervisor.

NO — EMS transports patient and calls BHC for pre-arrival notification and Code Stroke Activation Gives name of patient, DOB, last known well and glucose.

Non-Contrast CT scan results from Radiologist and lab work resulted, NIHSS completed, PCXR obtained, EKG completed, Neurologist reviews results and reassess patient.

Hemorrhage Confirmed Neuro-Surgery Consult

Patient meets criteria for IV tPA?

NO — Interventional-Radiologist and Neurologist confer and radiology specials team is called in by the I-Radiologist.

YES — Review risks/benefits with patient and family. Review exclusion criteria and administer tPA per protocol.

Patient to ICU post tPA or procedure

Timeline:
- Door to physician exam:          10 min
- Door to head CT:                 25 min
- Door to CT read & lab result:    45 min
- Door to Drug:                    <60 min
  Drip & Ship: to remain at sending facility no longer than 90 minutes.
  Transfer without tPA: to remain at sending facility no longer than 60 minutes.

Version: 12/24/14                                                    Dev: 09/2014

## EXHIBIT C

## STEMI Patient Transfer Protocol to Boone Hospital Center



STEMI patient presents at Facility

Facility is unable to provide Primary PCI for STEMI

Facility Physician will call 1.877.60.BOONE (1.877.602.6663)
Facility Physician will identify call as a "Code STEMI"

BOONE telecom operator will page the BOONE House Supervisor
Facility Physician will remain on the line

BOONE House Supervisor will greet Facility Physician and
- Confirm "Is your patient being referred for STEMI?"
- Obtain information from referring physician
- Initiate a three-party conference call by contacting the BOONE
  Cardiologist per the BOONE STEMI Protocol

Facility Physician will confer directly with receiving BOONE
Cardiologist
- STEMI with inability to provide Primary PCI
- Exclusion criteria for lytic treatment
- Need for rapid transfer

Facility will have prior arranged agreements with ground and air transfer agencies.
Expedited transport will be encouraged with consideration for restrictions of
inclement weather

Transfer/Airlift patient to
BOONE Emergency Department