IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| COMPREHENSIVE HEALTH OF PLANNED PARENTHOOD GREAT PLAINS, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 17-4207-CV-C-BP |
| RANDALL W. WILLIAMS, M.D., in his official capacity as Director of the Missouri Department of Health and Senior Services, *et al.*, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER AND OPINION DENYING PLAINTIFS' MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiffs have filed suit challenging regulations governing facilities that administer medication abortions. One of those regulations requires that a facility have a "complication plan" approved by the Missouri Department of Health and Senior Services ("DHSS"). Plaintiffs seek a temporary restraining order to prohibit enforcement of the requirement of a complication plan for their facility in Columbia, Missouri, ("the Columbia clinic"), contending that the requirements for a complication plan impose an undue burden on women's right to an abortion. Defendants contend that Plaintiffs have not tried to submit a compliant plan, nor have they presented evidence establishing the extent of any burdens women would experience if the Columbia clinic cannot comply. For the following reasons, Plaintiffs' Motion for a Temporary Restraining Order, (Doc. 4), is **DENIED**.

## I. BACKGROUND

There are two types of abortions: surgical abortions, and medication abortions. Medication abortions are only possible in the early stages of pregnancy, and involve the

administration of two medications. The first must be administered in a health facility or clinic, but the second is taken 24-48 hours later and can be taken by the woman anywhere, and is often taken by the woman in her home.

In the summer of 2017, the Missouri Legislature was called into a special session,[1] and amended section 188.021 of the Revised Missouri Statutes. Subsection 2 regulates medication abortions by prohibiting doctors from prescribing or administering the medications "without first obtaining approval from [DHSS] of a complication plan from the physician for administration of the drug or chemical to any patient."[2] The complication plan must "include any information deemed necessary by the department to ensure the safety of any patient suffering complications as a result of the drug or chemical in question." Subsection 3 allows DHSS to "adopt rules, regulations, and standards governing complication plans to ensure" patient safety. A physician who violates this statute may be charged with a Class A misdemeanor, and the facility may face a penalty as well. Mo. Rev. Stat. §§ 197.220-.230.

The amendments were due to go in effect on October 24, 2017. On October 2, 2017, DHSS issued a memorandum announcing that it would be announcing emergency rules establishing the requirements for complication plans that would go into effect on November 3, and presenting a summarized preview of those requirements. (Doc. 1-4.) The memorandum requires that the complication plan provide for a board-certified or board-eligible OB/GYN to be "available twenty-four hours a day, seven days a week to treat complications related to abortion

---

[1] In April, the Honorable Howard F. Sachs had enjoined enforcement of several abortion-related statutes and regulations. Primarily, those provisions required doctors who perform abortions have hospital-admitting privileges and required clinics or facilities to comply with the standards applicable to ambulatory surgical centers.

[2] The statute actually applies when the FDA label on a drug or chemical used to induce abortions "includes any clinical study in which more than one percent of those administered the drug or chemical required surgical intervention after its administration," but there is little question that this describes the medication used to induce abortions.

2

drugs prescribed or administered." Further, either the facility or the physician who prescribes or administers the drug must have a written contract with the OB/GYN or group of OB/GYNs. In addition, the OB/GYN must "[p]ersonally treat all complications, including those requiring surgical intervention" and must "[a]ssess each patient individually, and shall not, as a matter of course, refer all patients to the emergency room or other facilities or physicians unless the patient is experiencing an immediately life-threatening complication." If the physician who prescribes or administers the drugs is an OB/GYN, the physician or facility must have a "written agreement with an OB/GYN or group of OB/GYNs to ensure the required 24/7 coverage when the physician is unavailable to treat complications."

Between October 16 and October 24, Plaintiffs submitted three different complication plans to DHSS for approval. All three of these plans were combined plans, intended to apply to the Columbia clinic and the clinic in Kansas City. In addition, discussions between Plaintiffs and DHSS confirmed that the OB/GYN who would "personally treat" patients in Columbia would be located in Kansas City, making the ability to provide "personal" treatment problematic. All three of the joint proposals were denied.

DHSS promulgated its emergency regulation on October 24. (Doc. 1-2, pp. 6-9.)[3] The regulation tracks the memorandum's provisions. In addition, it specifies that "[e]ach abortion facility shall ensure that no drug is prescribed or administered via its facility until the facility has received written approval from the Department of the complication plan of the physician who will prescribe or administer the drug."

Plaintiffs proposed a complication plan specific to the Kansas City facility on October 26, but it was rejected by DHSS. Plaintiffs proposed a second Kansas City-specific plan on October 27, and this one was approved. Plaintiffs have not proposed a plan specifically for the Columbia

---
[3] All page numbers are those generated by the Court's CM/ECF system.

clinic. However, they did submit a "Patient Transfer Agreement" with a local hospital that "provides for patients to be admitted to the hospital if necessary." (Doc. 4-1, ¶ 9.) The agreement also establishes a protocol to ensure continuity of care, including the procedure for communication between the entities, the transfer of patient records, etc. (Doc. 4-1, pp. 27-29.) DHSS deemed this insufficient to constitute a complication plan, and the Court easily observes that the Patient Transfer Agreement makes no mention about the availability of an OB/GYN.[4]

Plaintiffs' Complaint asserts three claims, but they rely only on Count I for the TRO. Count I alleges that the regulation violates the Due Process Clause because "[i]t is an unnecessary health regulation that has the purpose and effect of imposing an undue burden on women's right to choose abortion." (Doc. 1, ¶ 54.)

A hearing was held on November 2, 2017, and the parties announced the only evidence they wished to present was contained in the affidavits submitted prior to the hearing. In addition to the facts already discussed, those affidavits also establish that in 2015 the Columbia clinic attempted to comply with Missouri statutes (the enforcement of which have since been enjoined; *see* footnote 1, *supra*) requiring that doctors performing abortions have admitting privileges. At that time, Plaintiffs found "two physicians with current hospital privileges who seriously considered providing services at the Columbia health center. However, because of the hostile political environment in Missouri toward abortion, those physicians were unwilling to subject themselves and their families to the scrutiny and potential harassment that comes with providing abortion[s]." (Doc. 4-2, ¶ 12.) An attempt was also made "to secure backup physicians with local hospital privilege who would be willing to enter into an agreement . . . to admit patients to the hospital on behalf of Comprehensive Health's physician." A "handful" of doctors expressed

---

[4] Defendants suggest the transfer agreement is limited to "emergency transfers of patients suffering on-site complications from surgical abortion." (Doc. 22. p. 27.) The Court sees nothing in the agreement that limits transfers to "patients suffering on-site complications from surgical abortion."

willingness, and three of those doctors were OB/GYNs – but none of them agreed to a contract "because of fear of harassment or professional consequences." (Doc. 4-2, ¶ 13.)

The affidavits state that the Columbia clinic was forced to cancel medication abortion procedures scheduled after the regulation went into effect. However, there is no evidence in the Record regarding the number of women who have sought medication abortions at the Columbia clinic, nor is there any evidence of how many of those women who desired a medication abortion have foregone an abortion instead of obtaining one elsewhere.

## II. DISCUSSION

The Eighth Circuit has "enumerated four factors to be weighed by the district court in deciding whether to grant or deny preliminary injunctive relief: (1) whether there is a substantial probability movant will succeed at trial; (2) whether the moving party will suffer irreparable injury absent the injunction; (3) the harm to other interested parties if the relief is granted; and (4) the effect on the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 112 (8th Cir. 1981) (en banc). While no single factor is determinative, since *Dataphase* the Eighth Circuit has consistently held that likelihood of success on the merits is the most important factor. *E.g.*, *Barrett v. Claycomb,* 705 F.3d 314, 320 (8th Cir. 2013); *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012). Satisfying this factor requires that Plaintiffs demonstrate that they have "a fair chance of prevailing." *Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 731-32 (8th Cir. 2008); *see also 1-800-411-Pain Referral Serv., LLC v. Otto,* 744 F.3d 1045, 1054 (8th Cir. 2014).

### A. Likelihood of Success on the Merits

Plaintiffs contend that they will prevail on their claim that the regulation is an undue burden on abortion under the Supreme Court's recent decision in *Whole Woman's Health v.*

*Hellerstedt,* 136 S. Ct. 2292 (2016). (Doc. 5, pp. 17-21.) Citing prior Supreme Court decisions, *Hellerstedt* "recognize[d] that the State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient." 136 S. Ct. at 2309 (quotation omitted). However, "a statute which, while furthering a valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Id.* (quotation omitted). And, "*unnecessary health regulations* that have the purpose or effect of *presenting a substantial obstacle* to a woman seeking an abortion impose an undue burden on the right." *Id.* (quotation omitted; emphasis supplied). Synthesizing these holdings, the Supreme Court held that courts must "consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Id.* at 2310.

The Court concludes Plaintiffs have not demonstrated a likelihood of success on the merits for two reasons. First, they have not demonstrated that they cannot comply with the regulation. Second, Plaintiffs have not presented sufficient evidence that the regulation imposes an undue burden on women's ability to obtain an abortion.

### *1. The Columbia Clinic's Ability to Comply with the Regulation*

Plaintiffs have not submitted an application solely on behalf of the Columbia clinic, nor have they identified efforts made to comply with the regulation. The combined applications made jointly by Columbia and Kansas City appear to have been denied for two reasons. First, DHSS requires that each facility have its own plan. Second, the OB/GYN in Kansas City could not provide the necessary personal care for patients in Columbia. Plaintiffs do not challenge DHSS's conclusion that the OB/GYN in Kansas City was insufficient to meet the Columbia clinic's obligations under the regulation. Instead, they contend that the evidence establishes they

6

cannot comply with the regulation and that any application on behalf of the Columbia clinic is futile because it cannot contract with an OB/GYN who has admitting privileges at a hospital. The regulation does not specifically require that the OB/GYN have admitting privileges, but as stated earlier the regulation requires that the OB/GYN "[p]ersonally treat all complications, including those requiring surgical intervention," and Defendants' attorney conceded that the regulation "likely" required that the OB/GYN have admitting privileges. This suggests that there may be a possibility of complying with the regulation by associating with an OB/GYN who does not have admitting privileges, but the circumstances under which this could happen are unclear.

Moreover, even if admitting privileges are required, Plaintiffs have not attempted to find a qualifying OB/GYN who will contract with the Columbia clinic. They last sought doctors to contract with in 2015, which was two years ago. This does not establish that Plaintiffs could not *today* find an OB/GYN who will satisfy the regulation's requirements. Moreover, Plaintiffs essentially ask the Court to completely absolve them of the need to have a complication plan because the admitting privilege requirement imposes an undue burden. But, if the admitting privilege requirement is the sole aspect of the regulation that imposes a burden (and so far, it is the only aspect of the regulation addressed by Plaintiffs), then that is the only requirement that should be enjoined.

At present, Plaintiffs have not demonstrated that they cannot comply with the regulation. Moreover, Plaintiffs challenge only the requirement that the OB/GYN have admitting privileges, but there may be circumstances where admitting privileges are not required to comply with the

regulation.[5] For these reasons, the Court cannot find that Plaintiffs are likely to succeed in demonstrating that the regulation imposes an undue burden.

### *2. Undue Burden on Women Seeking Medication Abortions*

As stated earlier, Plaintiffs rely on *Hellerstedt* to argue that the regulation imposes an undue burden. *Hellerstedt* considered several aspects of Texas law. One part of that law required doctors to have admitting privileges at a hospital within thirty miles of the location where the abortion was performed. However, the facts demonstrated that doctors could not comply with the requirement, which caused clinics to close, resulting in "fewer doctors, longer waiting times, and increased crowding" as well as "a significant increase in the distance women of reproductive age live from an abortion clinic." Moreover, the medical evidence demonstrated little to no benefit from the requirement. *Id.* at 2310-13. Thus, in comparing the (minimal) benefits to the burdens imposed, the Court held that the requirement constituted an undue burden on the constitutional right to an abortion.

In *Planned Parenthood of Ark. & E. Okla. v. Jegley,* 864 F.3d 953 (8th Cir. 2017), the Eighth Circuit applied *Hellerstedt* to an injunction barring a similar admitting-privilege requirement in Arkansas. The Eighth Circuit held that "the district court was required to make a finding that the Act's contract-physician requirement is an undue burden for a large fraction of women seeking medication abortions in Arkansas." 864 F.3d at 959. However, "the district court did not determine how many women would face increased travel distances," "failed to estimate the number of women who would forego abortions," and did not "estimate the number of women who would postpone their abortions." *Id.* This left the reviewing court with no basis for evaluating the district court's findings that the law imposed a burden because there was no

---

[5] For instance, it is unclear whether DHSS would approve a complication plan which combines (1) an association between the Columbia clinic and an OB/GYN with (2) the Patient Transfer Agreement the Columbia clinic already has in place. But, the Columbia clinic has not submitted this (or any other) plan.

8

way for the court to evaluate whether a "large fraction" of women seeking a medication abortion would forgo or postpone the procedure. *Id.* at 960.

Here, Plaintiffs have not presented evidence of the sort required by *Jegley*. There is no evidence regarding the number of women who will be affected, or how they will be affected. In addition, as discussed above there is no current evidence regarding the burden of complying with the regulation. Thus, regardless of the regulation's benefits, Plaintiffs lack of proof on this issue precludes a finding that they are likely to prevail on the merits.

Plaintiffs contend that *Jegley* does not apply because they "do[ ] not seek facial relief, but rather, only relief as applied to the Columbia health center." (Doc. 1, p. 21 n.6.) But *Jegley* applies and interprets *Hellerstedt,* and Plaintiffs rely on *Hellerstedt.* Labels aside, *Hellerstedt* involves a comparison of the regulation's benefits and burdens, and *Jegley* holds that *Hellerstedt* requires evidence of both. In addition, the Court notes that *Jegley* focused on the statute's effects on women in Fayetteville (who would have had to travel to Little Rock). This makes it hard to conclude that *Jegley* does not apply to a claim brought by or on behalf of women in Columbia (who would have to travel to Kansas City).

Plaintiffs also point to other cases in which evidence has been presented or findings have been made. In addition to *Hellerstedt,* Plaintiffs point to *Comprehensive Health of Planned Parenthood Great Plains v. Williams,* No. 16-4313. In that case (which involved the same parties as this one), Judge Sachs enjoined enforcement of a statute requiring doctors who perform abortions to have hospital admitting privileges. However, Judge Sachs' Order (issued without the benefit of the Eighth Circuit's decision in *Jegley*) does not contain findings specific to women in and near Columbia and instead relies on the findings made in *Hellerstedt.* More importantly, neither *Hellerstedt* nor Judge Sachs' Order addresses the requirement imposed by

9

the regulation at issue here. They are arguably similar, but they are sufficiently different that Judge Sachs' findings cannot substitute for evidence.

The Court harbors serious doubts that requiring the Columbia clinic to contract with an OB/GYN who will provide 24 hour a day, seven day a week treatment of all complications produces any benefits to women or the State. If the requirement is imposed and the Columbia clinic is unable to contract with such an OB/GYN, women in mid-Missouri will have to travel to Kansas City[6] to obtain medication abortions. They will take the first medication at the clinic, then travel back home to take the second medication. Should complications arise, the woman will (presumably) call the OB/GYN in Kansas City – but then, because of the distance involved, that OB/GYN will not personally treat the woman, regardless of the severity of the complication. Thus, the "continuity of care" the state extolls will be meaningless. And, if surgical intervention is required, the OB/GYN in Kansas City will have no choice but to refer the woman to her own doctor or the emergency room.

In contrast, if DHSS approves an association between the Columbia clinic and a Columbia physician and/or hospital, the woman could get personal care from a Columbia-area physician. The woman might be referred to the emergency room or her personal physician for serious complications – but, this is the exact same outcome if the woman was required to contact the OB/GYN in Kansas City. In both scenarios, the physician could communicate with the doctors in the hospital – except, the physician in Columbia would have greater proximity to the woman, and therefore the possibility of more personal involvement with the patient before referring her to the hospital than did the OB/GYN in Kansas City. So, the regulation may force women to travel two hours away to take the first medication, thereby precluding the possibility

---

[6] Or St. Louis, which is even further from Columbia.

of personal care from a Columbia-area physician (1) during the procedure and (2) for treatment of less-severe complications. At the same time, if a serious complication arises, both the OB/GYN in Kansas City and the doctor in Columbia would refer the woman to the emergency room, so that outcome does not change. This means there is a net detriment and no benefit. However, even with these doubts,[7] the Court cannot excuse the need for Plaintiffs to present *some* evidence of the number of women affected by the regulation.

In *Hellerstedt,* the Court held that driving distance alone would not qualify as an undue burden, but when combined with other burdens and "the virtual absence of any health benefit," distance to an available clinic can provide support to a finding that a regulation poses an undue burden. *Hellerstedt,* 136 S. Ct. at 2313. As the Eighth Circuit summarized, the evidence in *Hellerstedt* demonstrated that "the closures burdened abortion access because women seeking abortions also faced fewer doctors, longer waiting times, and increased crowding. Furthermore, patients would be less likely to get the kind of individualized attention, serious conversation, and emotional support at the abortion facilities." *Jegley,* 864 F.3d at 958 (quotations omitted). "As a result, the Supreme Court struck down [the Texas law] because its numerous burdens substantially outweighed its benefits." *Id.* With such evidence, the outcome today might be different.

This is not to say that Plaintiffs cannot make this showing. All the Court can say at present is that Plaintiffs have not yet established that the Court is likely to find an undue burden, and for that reason the Court cannot presently conclude that Plaintiffs are likely to succeed on the merits.

---

[7] The Court has doubts about the medical benefit of other portions of the regulation as well, but they have not been fully addressed by the parties so the Court will not discuss them here.

## B. The Remaining *Dataphase* Factors

The remaining *Dataphase* factors are less important than the first. The State's interest in promoting public health is affected if the Court completely excuses the Columbia clinic from having a complication plan. The Court is not prepared to conclude that the regulation is completely bereft of public health benefits, so the Court should be hesitant to hold that Plaintiffs need not have a plan when they have not proposed a plan specific to the Columbia clinic. The public interest coincides with the State's interest in this regard. Finally, there may be a threat of irreparable harm for those women who were scheduled to undergo a medication abortion at the Columbia clinic next week. However, this threat is not sufficient to overcome the other *Dataphase* factors.

## III. CONCLUSION

For these reasons, the Motion for Temporary Restraining Order, (Doc. 4), is **DENIED**.

**IT IS SO ORDERED.**

/s/ Beth Phillips
BETH PHILLIPS, JUDGE
Date: November 3, 2017    UNITED STATES DISTRICT COURT