IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| COMPREHENSIVE HEALTH OF | ) | |
| PLANNED PARENTHOOD | ) | |
| GREAT PLAINS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 17-4207-CV-C-BP |
| | ) | |
| RANDALL W. WILLIAMS, M.D., in his | ) | |
| official capacity as Director of the | ) | |
| Missouri Department of Health and | ) | |
| Senior Services, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER AND OPINION DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Comprehensive Health of Planned Parenthood Great Plains, ("Comprehensive Health"), and Reproductive Health Services of Planned Parenthood of the St. Louis Region, ("RHS"), filed suit challenging regulations governing facilities that administer medication abortions. Pending is their Motion for Preliminary Injunction. Following a hearing and extensive briefing by the parties, the Court concludes that the Motion for Preliminary Injunction, (Doc. 92), should be **DENIED**.[1]

### I. BACKGROUND

There are two common types of abortions: surgical abortions and medication abortions. The term "surgical abortion" is a slight misnomer in that the procedure is performed via vacuum aspiration and does not involve general anesthesia or require making an incision. Medication

---

[1] The Defendants in this case consist of the Director of DHSS, the Attorney General, and various county prosecutors, all of whom have been named in their official capacities. The prosecutors have deferred to the state defendants' defense of the regulation, and all arguments from Defendants have been presented by DHSS and the Attorney General.

abortions are typically utilized in the early stages of pregnancy, and involve the administration of two medications. The first, mifepristone, must be administered in a health facility or clinic. The second, misoprostol, is taken 24-48 hours later and can be taken by the woman anywhere, and is often taken by the woman in her home.

In the summer of 2017, the Missouri Legislature amended section 188.021 of the Revised Missouri Statutes. Subsection 2 regulates medication abortions by prohibiting doctors from prescribing or administering the medications without first obtaining approval of a "complication plan" from the Department of Health and Senior Services, ("DHSS"). The complication plan must "include any information deemed necessary by the department to ensure the safety of any patient suffering complications as a result of the drug or chemical in question." Subsection 3 allows DHSS to "adopt rules, regulations, and standards governing complication plans to ensure" patient safety. A physician who violates this statute may be charged with a Class A misdemeanor, and the facility may face a penalty as well. *E.g.,* Mo. Rev. Stat. §§ 197.205, 197.235.

The amendments were due to go in effect on October 24, 2017. On October 2, 2017, DHSS issued a memorandum previewing the regulations that DHSS anticipated adopting. (Doc. 1-4.) The memorandum requires that a complication plan provide for a board-certified or board-eligible OB/GYN to be "available twenty-four hours a day, seven days a week to treat complications related to abortion drugs prescribed or administered." Further, either the facility or the physician who prescribes or administers the drug must have a written contract with the OB/GYN or group of OB/GYNs guaranteeing that an OB/GYN will "[p]ersonally treat all complications, including those requiring surgical intervention" and "[a]ssess each patient individually, and shall not, as a matter of course, refer all patients to the emergency room or other facilities or physicians unless the patient is experiencing an immediately life-threatening complication." If the physician who

2

prescribes or administers the drugs is an OB/GYN, the physician or facility must have a "written agreement with an OB/GYN or group of OB/GYNs to ensure the required 24/7 coverage [by other OB/GYNs] when the physician is unavailable to treat complications." The memorandum does not specifically require that the OB/GYN have admitting privileges, but at the TRO hearing Defendants' attorney conceded that the regulation "likely" required that the OB/GYN have admitting privileges in order to satisfy the requirement that the OB/GYN "[p]ersonally treat all complications, including those requiring surgical intervention." And, Defendants have not suggested any circumstances in which admitting privileges would not be required as a condition for approval of a complication plan, and the testimony offered at the preliminary injunction hearing strongly suggests that no such circumstances actually exist.

DHSS promulgated an emergency regulation effectuating the statutory changes on October 24. (Doc. 1-2, pp. 6-9.)[2] The regulation tracks the memorandum's provisions. In addition, it specifies that "[e]ach abortion facility shall ensure that no drug is prescribed or administered via its facility until the facility has received written approval from the Department of the complication plan of the physician who will prescribe or administer the drug."

Comprehensive Health eventually obtained approval for a complication plan specific to its Kansas City facility, and RHS eventually obtained approval for a complication plan specific to its facility in St. Louis. Previously, in 2015, Comprehensive Health attempted to comply with separate regulations on surgical abortions requiring a similar contractual association with an OB/GYN possessing admitting privileges, but was unable to find a qualifying OB/GYN who would contract with the Columbia clinic. So, believing that it would still not be able to find an OB/GYN to satisfy the requirements for a complication plan, Comprehensive Health submitted

---

[2] All page numbers are those generated by the Court's CM/ECF system.

several "combined plans" for both the Kansas City and Columbia clinics. These proposals were rejected by DHSS insofar as the Columbia Clinic was concerned because the OB/GYN who would be available to "personally treat" patients was in Kansas City, and thus logistically unavailable to personally address an emergency in Columbia. Comprehensive Health then submitted a "Patient Transfer Agreement" with a local hospital that "provides for patients to be admitted to the hospital if necessary." (Doc. 4-1, ¶ 9.) The agreement also establishes a protocol to ensure continuity of care, including the procedure for communication between the entities, the transfer of patient records, etc. (Doc. 4-1, pp. 27-29.) The Patient Transfer Agreement makes no mention about the availability of an OB/GYN, and DHSS deemed this insufficient to constitute a complication plan.

Plaintiffs filed a three-count Complaint, alleging that the regulation violates (1) substantive Due Process rights, (2) the Equal Protection Clause, and (3) procedural Due Process rights. Comprehensive Health then sought a temporary restraining order ("TRO") barring enforcement of the regulation at its facility in Columbia, and its arguments were limited to the Due Process claim. The Court denied the motion on November 3, 2017, because Plaintiffs could not demonstrate a likelihood of success on the merits for two reasons, both of which related to Plaintiffs' evidence that the regulation imposed an undue burden on women's right to an abortion. Specifically, the Court held that the evidence was insufficient to establish that (1) Comprehensive Health could not comply with the regulation or (2) that the regulation imposed a burden on a significant number of women. (Doc. 26.)

After the Court issued its ruling, Plaintiffs contacted all OB/GYNs in or near Springfield and Columbia. For various reasons that need not be detailed in this Order, none agreed to associate with Plaintiffs. In January 2018 RHS submitted a complication plan that included a transfer agreement with a local hospital similar to the one Comprehensive Health had submitted.

4

Case 2:17-cv-04207-BP   Document 134   Filed 06/11/18   Page 4 of 18

(Plaintiffs' Ex. 10.) The plan was rejected by DHSS, apparently because the backup OB/GYNs were located in St. Louis and Overland Park, Kansas, and as with Comprehensive Health's application, RHS's transfer agreement was deemed insufficient to satisfy the regulation's requirements.

Plaintiffs then filed a Motion for Preliminary Injunction, seeking a preliminary injunction for both Plaintiffs based on Counts I and II. Evidence was received during hearings held on April 3 and April 6, 2018, and the parties have also submitted evidence via affidavits and depositions.[3] Given the issues to be decided and the basis for the Court's decision, there is no need to detail all of the evidence that was presented. Also, for the sake of clarity, the Court will address additional factual matters in context with its discussion of the legal issues. It should be presumed that the Court has considered and weighed all of the evidence, and the Court resolved any disputes consistent with the statements contained in this Order. For the reasons set forth below, Plaintiffs' Motion for Preliminary Injunction is **DENIED**.

## II. DISCUSSION

### A. Jurisdiction

Defendants contend that the case must be dismissed due to lack of standing because neither Plaintiff submitted a complication plan or tried to associate with an OB/GYN before filing suit.[4] Therefore, according to Defendants, standing did not exist when the case was filed and the case must be dismissed without prejudice. Plaintiffs contend that they had standing to challenge the constitutionality of a regulation they were obligated to obey, and even if attempted compliance is

---

[3] Plaintiffs' motion to strike some of the deposition excerpts submitted by Defendants, (Doc. 118), is denied.

[4] This argument ignores the fact that Comprehensive Health submitted complication plans for its facilities in Columbia and Kansas City, and the plans were rejected.

5

relevant it was futile in this case. The Court agrees with Plaintiffs that they had standing to initiate this suit.

"[T]he 'irreducible constitutional minimum' of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016) (citations omitted).

The existence of the regulation establishes Plaintiffs' standing to challenge its constitutionality. The regulation precludes Plaintiffs from providing medication abortions unless they meet certain requirements, and Plaintiffs face prosecution if they do not meet those requirements. Plaintiffs need not violate the allegedly constitutional law in order to challenge its constitutionality. *E.g., MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 128-29 (2007); *Steffel v. Thompson,* 415 U.S. 459 (1974). Plaintiffs only need to demonstrate that they are faced with a choice between (1) obeying a law they believe to be unconstitutional or (2) being prosecuted for disobeying it. For instance, in *Minnesota Citizens Concerned for Life v. Federal Election Commission,* 113 F.3d 129 (8th Cir. 1997), the plaintiffs challenged a regulation that limited political expenditures for certain entities. The Court of Appeals held that the plaintiffs suffered an injury because they either had to "make significant changes" to their operations to obey the regulation, "or risk a criminal enforcement action by disobeying the regulation." 113 F.3d 129, 131 (1997). Similarly, in *Virginia v. American Booksellers Ass'n, Inc.,* 484 U.S. 383 (1988), booksellers challenged restrictions on how material that was "harmful to juveniles" could be displayed, and that essentially required the plaintiffs to (1) create an adults-only section, (2) place materials behind the counter (which would diminish sales), (3) decline to carry certain materials,

6

or (4) bar minors from their stores. 484 U.S. at 389. The Supreme Court held that the booksellers had standing "as the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution." *Id.* at 392.[5]

This case is no different: Plaintiffs wish to provide medication abortions, and to do so they must either (1) comply with regulations that are expensive, difficult, and allegedly unconstitutional, or (2) face criminal prosecution. This establishes the injury necessary to satisfy the standing requirement.[6]

### B. Preliminary Injunctive Relief

The Eighth Circuit has "enumerated four factors to be weighed by the district court in deciding whether to grant or deny preliminary injunctive relief: (1) whether there is a substantial probability movant will succeed at trial; (2) whether the moving party will suffer irreparable injury absent the injunction; (3) the harm to other interested parties if the relief is granted; and (4) the effect on the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 112 (8th Cir.

---

[5] Several of these cases discuss a plaintiff's standing to bring a facial challenge to a regulation or statute. As will be addressed later in this Order, the parties do not agree whether Plaintiffs bring a facial or an as-applied challenge to the regulation, but the standing analysis does not depend on whether the constitutional challenge is facial or as-applied. Regardless of whether Plaintiffs bring a facial or as-applied challenge, they have standing to challenge the constitutionality of a regulation that they must obey upon penalty of criminal sanction.

[6] Defendants attach significance to the fact that "in Plaintiff's motion for a TRO, this Court held that Plaintiffs had not established that they could not comply with the Regulation at the time they sued." (Doc. 130, p. 8; *see also* Doc. 91, p.4.) However, as will be discussed in Part II.B, the substantive law governing Plaintiffs' claim required the Court to consider the burden imposed by the regulation, and the Court made its observation in the context of discussing whether Plaintiffs had demonstrated a likelihood of success on the merits. (Doc. 26, pp. 7-8 ("Plaintiffs have not demonstrated that they cannot comply with the regulation. [Therefore] the Court cannot find that Plaintiffs are likely to succeed in demonstrating that the regulation imposes an undue burden.").) Plaintiffs believed that they could demonstrate the burden necessary to prevail by relying on their experiences in 2015 and their inability to propose a complication plan that complied with the regulation. But the Court's conclusion that Plaintiffs failed to demonstrate a likelihood of success on the merits when they sought a temporary restraining order does not mean that they lacked standing to present their claim; it is well-accepted that a plaintiff's inability to prove its claim does not mean that it lacks standing. *E.g., Braden v. Wal-Mart Stores, Inc.,* 588 F.3d 585, 591 (8th Cir. 2009).

1981) (en banc). While no single factor is determinative, since *Dataphase* the Eighth Circuit has consistently held that likelihood of success on the merits is the most important factor. *E.g.*, *Barrett v. Claycomb,* 705 F.3d 314, 320 (8th Cir. 2013); *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012). Satisfying this factor requires that Plaintiffs demonstrate that they have "a fair chance of prevailing." *Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 731-32 (8th Cir. 2008); *see also 1-800-411-Pain Referral Serv., LLC v. Otto,* 744 F.3d 1045, 1054 (8th Cir. 2014).

### *1. Count I – Due Process*

Plaintiffs contend that they will prevail on their claim that the regulation violates the Due Process Clause because it places an undue burden on women's access to abortion under the Supreme Court's recent decision in *Whole Woman's Health v. Hellerstedt,* 136 S. Ct. 2292 (2016). Citing prior Supreme Court decisions, *Hellerstedt* "recognize[d] that the State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient." 136 S. Ct. at 2309 (quotation omitted). However, "a statute which, while furthering a valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Id.* (quotation omitted). And, "*unnecessary health regulations* that have the purpose or effect of *presenting a substantial obstacle* to a woman seeking an abortion impose an undue burden on the right." *Id.* (quotation omitted; emphasis supplied). Synthesizing these holdings, the Supreme Court held that courts must "consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Id.* at 2310. A regulation imposes a substantial obstacle only if "in a large fraction of the cases in which [the regulation] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Planned*

*Parenthood of SE PA v. Casey,* 505 U.S. 833, 895 (1992); *see also Planned Parenthood of Ark. & E. Okla. v. Jegley,* 864 F.3d 953, 958 (8th Cir. 2017), *cert. denied,* 2018 WL 2404154 (2018).

### (a) Likelihood of Success on the Merits

#### (i) The Regulation's Benefits

The Court begins by considering the regulation's benefits, and to do so the Court must also discuss the risks associated with medication abortions. The evidence establishes that complications are rare and the vast majority occur after the patient has taken the first medication and has returned home. Major complications – those requiring hospitalization, a blood transfusion, or surgery – occur in only 0.3% of all cases. Minor complications occur in no more than 5% of the cases.

The most common minor complication, occurring two to five percent of the time, is an incomplete abortion. This occurs when the treatment stops the pregnancy's progress but does not cause the woman to fully expel the tissue, blood, and other matter from her body. There are three appropriate treatments for an incomplete abortion: (1) wait to give the medication more time to work, (2) administer a second dose of misoprostol, or (3) undergo a vacuum aspiration (which is a standard treatment following a miscarriage). There is no evidence that any of these options – including vacuum aspiration – needs to be performed by an OB/GYN or in a hospital.[7] The next most common minor complication, occurring less than 1% of the time, is a continuing pregnancy; that is, the medication did not terminate the pregnancy. Treatment for a continuing pregnancy consists of (1) taking a second dose of misoprostol, (2) repeating the entire process by taking both mifepristone and misoprostol, or (3) undergoing a vacuum aspiration.

---

[7] In many states, nurse practitioners are permitted to perform vacuum aspirations, but not in Missouri. Doctors other than OB/GYNs can perform vacuum aspirations, although most emergency room doctors are not trained to do so. (*E.g.,* Doc. 115, pp. 30, 112-13, 286; Doc. 116, pp. 62, 90.)

9

With this backdrop in place, the Court turns to the regulation's benefits as identified by Defendants. First, they address a provision requiring Plaintiffs to make a triage nurse or other practitioner available by phone at all times of the day or night to address concerns and potential complications when the patient returns home. (Doc. 122, p. 27.) However, Plaintiffs do not challenge this requirement; their challenge is limited to the requirement that they have a contract with a backup OB/GYN or group who is available 24/7 to personally treat complications and has admitting privileges at a nearby hospital.

Defendants next assert that the regulation increases the accuracy of diagnosis because in-person evaluation is superior to evaluation over the phone. (Doc. 122, pp. 24-27.) However, the regulation does not require in-person evaluations. To the contrary, as stated in the preceding paragraph, the regulation requires that Plaintiffs provide patients with the ability to consult over the phone, and permits a consultation to take place with a nurse practitioner. Moreover, the regulation does not require that in-person evaluations be performed by OB/GYNs. Therefore, requiring an arrangement with an OB/GYN does not augment the diagnostic process.

Defendants also claim that the regulation promotes the State's interest in accurately tracking and documenting complications from medication abortions. However, the evidence does not establish how the regulation furthers this interest. In their written arguments Defendants point to the fact that for at least six years one abortion provider in Missouri did not file reports of complications as required by state law. (Doc. 122, p. 38.) Accepting this as true, Defendants do not explain how requiring that doctor – or any doctor – to enter a contractual agreement with an OB/GYN possessing admitting privileges will addresses the problem, either with respect to that one abortion provider's failings or as a general matter. The closest explanation is Defendants' suggestion that follow-up care by an OB/GYN will provide "greater opportunity to obtain

treatment with a physician . . . who will know that the complications are abortion related." (Doc. 122, p. 38.) However, there was no evidence that underreporting occurs because doctors and nurse practitioners do not recognize that complications are abortion-related. And, as discussed in the preceding paragraph, even with the regulation a significant amount of assessment and treatment may be performed by health care professionals other than the OB/GYN mandated by the regulation – so the regulation is ill-suited to this purpose.

In a series of related arguments,[8] Defendants contend that the regulation insures that there is a medical professional available who can perform a vacuum aspiration if necessary (as in the case of an incomplete abortion or a continuing pregnancy) or to otherwise insure continuity of care. The evidence establishes that the American College of Obstetricians and Gynecologists ("ACOG") has advised that those providing medication abortions should be trained to perform vacuum aspirations or have the ability to refer patients to a medical professional who can perform vacuum aspirations. However, the regulation goes further than is necessary to achieve this benefit; the objective can be achieved simply by requiring the prescribing doctor to have a relationship with another doctor or facility capable of performing a vacuum aspiration. There is no evidence that there are any benefits attributable to the extra requirements that the prescribing physician also have an agreement with a specific doctor, requiring that doctor to be an OB/GYN, or requiring that doctor have admitting privileges.[9]

---

[8] This discussion relates to several of Defendants' proffered justifications, which seem to be different ways of saying the same thing. For instance, it addresses the justifications of insuring patient access to a physician, (Doc. 122, pp. 29-30), insuring availability of treatment of a physician, (Doc. 122, pp. 30-31), insuring that the administering doctor has a pre-existing relationship with another doctor, (Doc. 122, p. 32), assuring continuity of care, (Doc. 122, pp. 32-33), and assuring that a doctor is responsible for the patient's care, (Doc. 122, pp. 34-35).

[9] In addition, the Court notes that DHSS relaxes similar requirements for birthing centers, even though carrying a pregnancy to term poses greater risks than a first trimester abortion. In fact, at least one birthing center has a transfer agreement with a local hospital, which sounds similar to the transfer agreements Plaintiffs have with area hospitals. These observations undermine Defendants' insistence that the regulation provides significant benefits.

11

Defendants also justify the regulation as a method of minimizing referrals to emergency rooms.[10] The Court harbors serious doubts that the regulation achieves this objective – but even if it does, the benefit achieved is minimal. That small benefit is further reduced by several factors. First, for some women, the emergency room will be the most appropriate place to receive the emergency treatment that is necessary (such as when the emergency room is closer to the woman than any other facility). Second, as noted in the Court's Order, at least some women will travel to Kansas City to obtain a medication abortion.

> They will take the first medication at the clinic, then travel back home to take the second medication. Should complications arise, the woman will (presumably) call the OB/GYN in Kansas City – but then, because of the distance involved, that OB/GYN will not personally treat the woman, regardless of the severity of the complication. Thus, the "continuity of care" the state extolls will be meaningless. And, if surgical intervention is required, the OB/GYN in Kansas City will have no choice but to refer the woman to her own doctor or the emergency room.

(Doc. 26, p. 10.) Defendants respond to this point by suggesting that this observation is "essentially arguing that the Regulation has no benefit if Plaintiffs do not comply with it." (Doc. 122, p. 35.) However, nothing in this sequence of events violates the regulation. Comprehensive Health's clinic in Kansas City has an approved complication plan, and it is permitted to provide medication abortions to women. Nothing in the regulation precludes the clinic from providing medication abortions to women in and around Columbia or Springfield. And, nothing in the regulation requires a woman who returns home and develops complications to return to Kansas City for treatment – or precludes such a woman from going to the emergency room near her home. The regulation prohibits referring patients to the emergency "as a matter of course," but this sequence of events does not seem to be prohibited.

---

[10] This discussion addresses several of Defendants' proffered justifications related to emergency rooms. (Doc. 122, pp. 30-32.)

Thus, the Court concludes that the regulation has virtually no benefit. The regulation may provide an alternative to emergency room care for an uncertain portion of the 0.3% of women who need hospital care, but it simultaneously increases the possibility that other women who traveled to Kansas City will to go the emergency room closer to home for routine care that would otherwise have been performed at the clinic in Springfield or Columbia. The regulation may also insure that there is a doctor capable of performing a vacuum aspiration as recommended by OCAG, but its effort to do so is stricter than necessary; achieving this objective does not require a regulation mandating that Plaintiffs have an agreement with (1) an OB/GYN who (2) has hospital admitting privileges.[11]

### *(ii) The Regulation's Burdens*

The Court must weigh these benefits against the regulation's burdens, but first it is necessary to discuss the law that guides this inquiry. A state regulation that increases the distance a woman must travel or the expense of the procedure will not, alone, constitute an undue burden. *E.g., Hellerstedt,* 136 S. Ct. at 2313; *Casey,* 505 U.S. at 874. Instead, the undue burden test focuses on the regulation's effect on the availability of, or access to, abortion services. It is not enough for the regulation to make it more difficult for women to obtain an abortion; instead, it must be a substantial burden on their ability to obtain an abortion. *Hellerstedt,* 136 S. Ct. at 2313 (holding that an admitting-privileges requirement presented a substantial obstacle because it caused the

---

[11] The Court takes particular note of the requirement for admitting privileges, in light of *Hellerstedt*'s reliance on the trial court's findings that this requirement provided no medical benefit. *Hellerstedt,* 136 S. Ct. at 2311-12. In this case, Defendants did not specify any particular reason for the requirement, and there is evidence that Defendants either do not impose or agree to waive the requirement in a variety of contexts. The Court strongly suspects that this requirement has been imposed specifically because DHSS is aware that it is difficult for abortion providers to comply with it, and simply constitutes a backdoor effort to require admitting privileges in an attempt to avoid (or ignore) *Hellerstedt*. The Court's suspicions do not justify an injunction, however, because (1) Plaintiffs challenge the regulation as a whole, and not just this component and (2) for reasons that will be discussed, the primary reason for denying an injunction is the current lack of proof that the regulation imposes an undue burden on women's right to obtain an abortion.

13

closure of half of Texas' clinics and effectively made abortions unavailable to women in vast portions of the state); *Casey,* 505 U.S. at 993-94 (holding that spousal notification law did not "merely make abortions a little more difficult or expensive to obtain" but rather was "likely to prevent a significant number of women from obtaining an abortion.")

In determining the fraction for whom the regulation is a substantial obstacle, the fraction's denominator is the women for whom the regulation is "an actual rather than an irrelevant restriction." *Hellerstedt,* 136 S. Ct. at 2320 (quoting *Casey,* 505 U.S. at 895.) The regulation under scrutiny relates to medication abortions only; therefore, the denominator is limited to women who seek medication abortions. *Jegley,* 864 F.3d at 959. The parties dispute whether the denominator should include a geographic component. For instance, Plaintiffs have suggested that the denominator should be "all women in Missouri who seek medication abortions and who are closer to Columbia or Springfield than Kansas City or St. Louis." Defendants argue that the denominator should be all women in the state who would seek a medication abortion. There is no present need for the Court to resolve this issue because, as discussed below, Plaintiffs cannot carry their burden even if the smaller denominator they propose is used.

Finally, calculating the fraction requires Plaintiffs to present evidence regarding the number of women for whom the regulation serves as an obstacle. In *Jegley*, the Eighth Circuit applied *Hellerstedt* and held that "the district court was required to make a finding that the Act's contract-physician requirement is an undue burden for a large fraction of women seeking medication abortions in Arkansas." *Jegley,* 864 F.3d at 959. However, "the district court did not determine how many women would face increased travel distances," "failed to estimate the number of women who would forego abortions," and did not "estimate the number of women who would postpone their abortions." *Id.* The Court of Appeals was "left with no concrete district

14

court findings estimating the number of women who would be unduly burdened by the contract-physician requirement—either because they would forgo the procedure or postpone it—and whether they constitute a 'large fraction' of women seeking medication abortions in Arkansas such that Planned Parenthood could prevail in its facial challenge to the contract-physician requirement." *Id.* at 960. Plaintiffs insist that *Jegley* does not apply because they are not challenging the regulation on its face, but are rather raising an as-applied challenge, contesting the regulation as applied to their clinics in Columbia and Springfield. The Court is not persuaded that *Jegley* is distinguishable in this manner. As the Court previously explained:

> *Jegley* applies and interprets *Hellerstedt,* and Plaintiffs rely on *Hellerstedt.* Labels aside, *Hellerstedt* involves a comparison of the regulation's benefits and burdens, and *Jegley* holds that *Hellerstedt* requires evidence of both. In addition, the Court notes that *Jegley* focused on the statute's effects on women in Fayetteville (who would have had to travel to Little Rock). This makes it hard to conclude that *Jegley* does not apply to a claim brought by or on behalf of women in Columbia (who would have to travel to Kansas City).

(Doc. 26, p. 9.)[12]

Plaintiffs have established that the clinics in Columbia and Springfield cannot submit a compliant complication plan because they cannot associate with an OB/GYN who possesses admitting privileges.[13] There is also no question (as Plaintiffs argue) that any burden involving travel distances necessarily fails heavier on women with limited economic resources. However, as discussed earlier, these facts demonstrate that the regulation makes it more difficult or expensive to obtain an abortion, but they do not establish an undue burden under *Casey* or *Hellerstedt*. In

---

[12] In *Jegley,* the court and the parties treated the availability of surgical abortions in Little Rock as a "viable alternative" to medication abortions. Thus, women in Little Rock were regarded as not burdened by the regulation, which is why the focus was on women outside of the Little Rock area. *Jegley,* 864 F.3d at 957. This is similar to the present case, where the women in Kansas City and St. Louis are not burdened by the regulation, which is why the focus is on women elsewhere in the state.

[13] The Court specifically rejects Defendants' arguments that Plaintiffs have not sufficiently proven this point.

15

*Hellerstedt*, for instance, the law at issue would have left the state of Texas with seven or eight facilities to serve the entire state, meaning each such facility would have to serve between 7,500 and 10,000 patients per year. *Hellerstedt,* 136 S. Ct. at 2301-02. This fact, alone, would have precluded most women's access to an abortion, even before the geographic realities (all of the clinics were located in Houston, Austin, San Antonio, and Dallas/Fort Worth) were factored into the analysis. There is no similar evidence in this case.

Plaintiffs' expert testified that 14% of the women who desire a medication abortion will forgo or postpone their abortions because of the increased distance to Kansas City or St. Louis. The Court will accept this figure for purposes of discussion. However, this figure must be reduced because, as Defendants point out, women can and will elect to have a surgical abortion. As stated earlier, the Columbia clinic already provides surgical abortions, and according to Defendants there is no "legal impediment" to the Springfield clinic performing them.[14] The evidence establishes that "the vast majority" of women in Columbia who prefer a medication abortion but do not wish to travel to Kansas City will ultimately choose to have a surgical abortion. (Doc. 115, p. 229; *see also* Doc. 115, pp. 285-86.) Plaintiffs discount this factor, contending that many women prefer to have medication abortions. The Court does not doubt this fact; however, for purposes of the Constitution, women are not necessarily entitled access to the procedure that they prefer. In *Gonzales v. Carhart,* the Supreme Court considered a federal statute that restricted use of a particular method of performing abortions: dilation and evacuations, or "D&E." The law was

---

[14] The Court finds Defendants' reliance on the availability of surgical abortions to defend the constitutionality of the regulation on medication abortions interesting for a variety of reasons. In particular, DHSS has enacted similar regulations on surgical abortions, requiring the doctor performing the vacuum aspiration have a contractual relationship with an OB/GYN who possesses hospital admitting privileges. Surgical abortions are available in Columbia (and potentially in Springfield) only because the regulations related to surgical abortions were preliminarily enjoined in another case pending in this court, *Comprehensive Health of Planned Parenthood Great Plains v. Williams,* No. 16-4313. The Court further notes that Defendants are seeking to overturn that injunction; if they succeed, and if the Columbia and Springfield clinics are precluded from performing surgical abortions, the Court's analysis in this case may need to be revisited.

16

challenged on several grounds, including because it violated *Casey* by imposing an undue burden on women's right to obtain an abortion. *Gonzales v. Carhart,* 550 U.S. 124, 156 (2007). In discussing whether the prohibition of the procedure constituted an undue burden, the Court concluded that the law was not invalid "given the availability of other abortion procedures that are considered to be safe alternatives." *Id.* at 167. Here, there is a safe alternative to medication abortion available to women in Columbia, and Defendants are not currently precluding RHS from providing surgical abortions in Springfield. Therefore, Plaintiffs have not established that the regulation of medication abortions presents a substantial obstacle because the Constitution protects women's right to an abortion, not women's right to a particular method of abortion. *E.g., Planned Parenthood SW Ohio Region v. DeWine,* 696 F.3d 490, 516 (6th Cir. 2012).

### *(iii) Conclusion with Respect to Likelihood of Success on the Merits*

For these reasons, the Court preliminarily concludes that Plaintiffs have established that requiring Plaintiffs to have a contractual agreement with an OB/GYN (1) near the clinic in question who is (2) available around the clock to provide personal care and who (3) possesses hospital admitting privileges will produce – *at best* – very limited medical benefit. However, Plaintiffs have not established that the regulation is a substantial burden to a large fraction of women seeking a medication abortion because (1) few of those women will forego a medication abortion and (2) a large number of those who do forego a medication abortion will opt to have a surgical abortion. Therefore, despite the regulation's minimal benefits, the Court cannot conclude that Plaintiffs have demonstrated that the regulation is a substantial obstacle to a large fraction of women's right to obtain an abortion, so Plaintiffs have not demonstrated that they are likely to succeed on the merits.

### (b)  The Remaining *Dataphase* Factors

The remaining *Dataphase* factors are less important than the first.  While the State's (i.e., the public's) interests in the regulation are minimal, they exist.  Plaintiffs have intimated that the transfer agreements they have are sufficient to satisfy these interests, but beyond the existence of the transfer agreements Plaintiffs presented little basis for concluding that they would adequately serve the regulation's objectives (limited though those objectives may be).  The remaining factors are too insubstantial to outweigh the Court's conclusion that Plaintiffs have not demonstrated a likelihood of success on the merits.

### 2.  Count II – Equal Protection

Plaintiffs also contend that a preliminary injunction is justified based on its Equal Protection claim.  Their argument is that the regulations subject medication abortion to different requirements than other medical procedures, and that the different scrutiny is subject to strict scrutiny because it discriminates based on a fundamental right (abortion.)  (Doc. 124, pp. 65-66.)  However, Plaintiffs have not established that their Equal Protection claim is analyzed differently than their Due Process Claim.  In fact, the Court strongly suspects that the Supreme Court and the Eighth Circuit would hold that *Casey* and *Hellerstedt* apply to Count II just as they apply to Count I.  Given the Court's prior analysis of Count I, Plaintiffs' request for a preliminary injunction on Count II must also be denied.

### III.  CONCLUSION

For these reasons, the Motion for Preliminary Injunction, (Doc. 92), is **DENIED**.

**IT IS SO ORDERED.**

/s/ Beth Phillips
BETH PHILLIPS, JUDGE
Date: June 11, 2018 UNITED STATES DISTRICT COURT